[No. H032186. Sixth Dist. Oct. 29, 2010.]

FRANCIS A. McCASKEY, Plaintiff and Appellant, v.
CALIFORNIA STATE AUTOMOBILE ASSOCIATION et al., Defendants
and Respondents.
CHARLES LUKE, Plaintiff and Appellant, v.
CALIFORNIA STATE AUTOMOBILE ASSOCIATION et al., Defendants
and Respondents.
JOHN MELLEN, Plaintiff and Appellant, v.
CALIFORNIA STATE AUTOMOBILE ASSOCIATION et al., Defendants
and Respondents.

## Counsel

Law Offices of Daniel U. Smith, Daniel U. Smith, Ted W. Pelletier; Law Office of Patrick K. Tillman and Patrick K. Tillman for Plaintiffs and Appellants.

Reed Smith, Paul D. Fogel, Raymond Cardozo; Littler Mendelson, John C. Fish, Jr., and Laura E. Hayward for Defendants and Respondents.

## Opinion

**RUSHING, P. J.**—Plaintiffs Charles Luke, Francis A. McCaskey, and John Mellen brought these actions against California State Automobile Association (CSAA) and California State Automobile Association Inter-Insurance Bureau charging breach of contract and age discrimination.[1] The gist of the claims was that defendant brought about plaintiffs' discharges by breaching a promise to permit senior sales agents to continue in it's employ under relaxed

---

[1] No meaningful role has been attributed to California State Automobile Association Inter-Insurance Bureau, and no material distinction has been drawn between it and CSAA in connection with any matter at issue on this appeal. Accordingly, we will generally speak of defendants in the collective singular as "CSAA" or "defendant."

sales quotas. The trial court entered summary judgment for defendant primarily on the grounds that it was contractually entitled to rescind the promise, and that plaintiffs failed to raise a triable issue of fact concerning defendant's claimed nondiscriminatory reasons for eliminating the policy. We find that the record raises a triable issue of fact on the contract claim over the question whether defendant honored the policy for an agreed time or, if no agreement as to time can be inferred from the terms and circumstances of the employment contract, for a reasonable time. The record also presents triable issues of fact concerning the genuineness of defendant's claimed reasons for eliminating the policy. Accordingly, we will reverse the judgment.

## BACKGROUND

At the outset of the events giving rise to this suit, each of the plaintiffs was employed by CSAA as a sales agent (sales representative) at its San Jose-Oakridge branch office. CSAA hired plaintiff Mellen in 1969 at the age of 25, McCaskey in 1971 at the age of 27, and Luke in 1976 at the age of 31. When hired, each signed an "Appointment Agreement." Although the version signed by Mellen and McCaskey differed slightly from the one signed by Luke, both versions recited that CSAA would pay commissions on new and renewal business in accordance with a "Compensation Plan," which CSAA reserved the right to modify. Each provided that either party could terminate the agreement either "forthwith" or "without prior notice."

The compensation plan set out formulas for calculating the commissions plaintiffs would be paid for the various kinds of insurance they were expected to sell. The plan included sales quotas, called "Minimum Sales Quotas" in 1969, and later known as "minimum production requirements," "MPR's," or sometimes "MSPR's." In the early versions of the plan these were expressed as a minimum number of new or reinstated policies or memberships the agent was required to sell each month in four categories. By 2001 they had come to be expressed in the dollar value of "New Gross Written Premium," apparently meaning premiums on newly sold policies. At least some versions of the plan, including the 1969, 2001, and 2005 versions, expressly provided that failure to meet sales quotas was grounds for discipline or termination.[2]

In 1973 CSAA amended the compensation plan to provide that quotas would be reduced by 15 percent for agents who reached the age of 55 with at least 15 years of service, and by a further 25 percentage points (for a total of

---

[2] The 1969 plan stated that an agent's continued employment was "contingent upon" meeting quota and that one who failed to do so would be "subject to termination." The 2001 and 2005 plans stated that such a failure could "lead to corrective action up to and including termination." The record does not disclose whether intermediate versions contained similar language, but there seems little reason to doubt that they did.

40 percent) for agents who reached 60 with 20 years of service. The effect of this provision was to permit agents to work less hard to produce new business without risking termination of employment for failure to satisfy the MPR's. It remained in effect through 2000. By that time all of the plaintiffs had qualified for the MPR reductions; each had more than 20 years in service to CSAA, and Mellen and McCaskey were 57 years old, while Luke was 55 years four months old.

In early 2001, CSAA adopted a compensation plan that did not provide any reduction in MPR's for senior agents. Copies of this plan were transmitted to affected employees in late February. The plan included a signature page for agents to acknowledge that it was "Accepted and Approved." None of the plaintiffs signed it. Instead they engaged counsel, who wrote to CSAA on their behalf stating that elimination of the MPR reductions as to plaintiffs would violate the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), as well as the existing employment agreement, and that they would not sign it. This triggered an exchange of correspondence culminating in a statement by CSAA that plaintiffs would not be fired for failing to sign the new plan, but that its terms would govern their compensation, and that the prior plan, including the reduction in MPR's based on age and seniority, was "no longer in effect."

Plaintiffs continued to work for CSAA. Mellen and Luke at all times continued to produce new business sufficient to meet quota with no adjustment for seniority. McCaskey, however, failed to do so, and CSAA "counseled" him on several occasions beginning in 2002. Each such occasion resulted in issuance of a "Corrective Action Form" with the recital that "[f]ailure to maintain minimum production will result in corrective action, up to and including termination." On February 22, 2005, CSAA discharged him for the stated reason that he had not met MPR's for the preceding month.

Meanwhile, CSAA had prepared a newly revised compensation plan, to take effect April 1, 2005. Copies of the plan were apparently transmitted to all agents in February, 2005. CSAA told agents they would have to choose between signing the agreement by its effective date and terminating their employment as of that date. Because the plan still allowed no reduction in MPR's for veteran employees, Luke and Mellen refused to sign it. As of April 1, 2005, CSAA viewed them as having "left [its] employ."[3]

The compensation plans generally entitled agents to commissions not only on sales of new policies (new business), but also on renewals of policies

---

[3] For purposes of the motion for summary judgment and this appeal, the parties and the trial court treated Mellen and Luke as having been discharged. We will do likewise.

originally sold by them. Policies sold by an agent, and the customers who had bought them, were known as "book of business." Books of business could grow quite large as an agent's time in service lengthened.[4]

Plaintiffs all declared that prior to 2001 it was CSAA's standard practice to transfer a departing sales representative's book of business to other representatives in the same office. From this it may be inferred that, prior to 2001, CSAA would generally owe a renewal commission to someone, whether or not the original seller of the policy was still in its employ. This approach apparently reflected a business model under which sales representatives bore significant if not primary responsibility for customer service. Defendant attempted below to depict this responsibility as a burden on sales representatives from which it sought to relieve them so that they could devote more time and energy to the development of new business. Plaintiffs attempted to depict it as a minimal burden but as an opportunity to generate new business from existing customers, which opportunity CSAA was intent on diverting to hourly employees so as to avoid any obligation to pay commissions on the resulting sales. Whatever part of the truth each side's depiction may constitute, it is undisputed that beginning in the 1990's CSAA began to move many of its customer service functions and at least some of its sales functions into telephonic "call centers" where hourly employees fielded calls from existing and potential customers. At the same time, the 2001 compensation plan

---

[4] According to the declaration of plaintiffs' expert, Robert Westin, each plaintiff had over 3,000 existing customers at the end of 2004, with a book of business of at least $3.5 million in premiums and, in Luke's and Mellen's cases, over $4 million. Defendant did not dispute these figures, but objected to the portion of the declaration where they appear on the ground that the data relied upon to derive them were "not the data used by CSAA to make its decisions, include[d] data for two other entities, and [were] not even in existence at the time CSAA made its employment practices decisions." These assertions were cited to a supplemental declaration from a CSAA officer, which said nothing about the data used to compile plaintiffs' sales figures. Accordingly the objection was, at least to that extent, unsound, and we will disregard it. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [113 Cal.Rptr.3d 327, 235 P.3d 988] [objections not ruled upon presumed overruled, but preserved for appeal].)

Moreover, another of plaintiffs' witnesses declared that one of defendant's own branch managers alluded to plaintiffs' "*huge books of business*" as a motive or reason for their discharge. The only colorable objection to this testimony was that "[i]nsufficient information is given as to the speaker to establish that an exception to the hearsay rule applies." However, the declarant, Ona Brooks, identified the speaker by name (Cheryl Turner) and title (branch manager of the Mountain View office), which made her, apparently, Brooks's supervisor. Brooks also described the circumstances of the quoted statement, i.e., Turner was attempting to address concerns Brooks had raised about "the negative changes that were happening at the company." We think this was an adequate prima facie showing—particularly given the constraints of summary judgment procedure—that the declarant "had express or implied authority to make that kind of statement" to an employee she supervised on behalf of CSAA. (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 121, p. 828; see Evid. Code, § 1220; *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 572–573 [69 Cal.Rptr.2d 389]; *W. T. Grant Co. v. Superior Court* (1972) 23 Cal.App.3d 284, 286–287 [100 Cal.Rptr. 179].)

provided for a category of accounts, known as "House Accounts," on which "[c]ommissions are not payable to a Sales Representative." CSAA's chief witness, Matthew Newcomer, testified in deposition that when plaintiffs were discharged, none of their accounts were reassigned to anyone: "We don't reassign books of business any longer." It may be inferred that their existing books of business all became "house accounts," terminating any liability CSAA would otherwise have for renewal commissions.

Plaintiffs each filed an action against CSAA on June 6, 2005, asserting claims for breach of contract, age discrimination in violation of FEHA, and "Tortious Wrongful Termination—Retaliation." CSAA answered with a general denial and 36 affirmative defenses. The court ordered the three cases consolidated for trial. CSAA moved against each plaintiff for summary judgment or, in the alternative, summary adjudication on each cause of action. The trial court granted the motions. It entered judgment, and denied plaintiffs' motions for reconsideration. Plaintiffs filed timely notices of appeal.

### DISCUSSION

#### I. *Breach of Contract*

##### A. *Introduction*

"We summarized the principles governing an appeal of this type in *Reeves v. Safeway Stores* (2004) 121 Cal.App.4th 95, 106–107 [16 Cal.Rptr.3d 717] (*Reeves*): 'On appeal from an order granting summary judgment "we must independently examine the record to determine whether triable issues of material fact exist. [Citations.]" [Citation.] The question is whether defendant " ' "conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." [Citation.]' [Citation.]" ([Citations]; see *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335, fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*) ["the issue . . . is simply whether, and to what extent, the evidence submitted for and against the motion . . . discloses issues warranting a trial"].) . . . [Citation.] Moreover, "we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor. [Citations.]" [Citations.] And a plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively *negating* that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence to prove its existence.

[Citations.]' " (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 710–711 [81 Cal.Rptr.3d 406] (*Mamou*).) In determining whether a triable issue was raised or dispelled, we must disregard any evidence to which a sound objection was made in the trial court, but must consider any evidence to which no objection, or an unsound objection, was made. (See *Reid v. Google, Inc., supra,* 50 Cal.4th 512, 534; Code Civ. Proc., § 437c, subds. (b)(5), (c), (d).) Such evidentiary questions, however, are subject to the overarching principle that the proponent's submissions are scrutinized strictly, while the opponent's are viewed liberally.

"The first step in analyzing a motion for summary judgment is to identify the issues framed by the pleadings. It is these allegations to which the motion must respond by showing that there is no factual basis for relief or defense on any theory reasonably contemplated by the opponent's pleading." (6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 212, p. 650.) Here plaintiffs alleged that CSAA breached the parties' contract by (1) discontinuing the MPR reductions after plaintiffs had qualified for those reductions; (2) interfering with plaintiffs' performance of the contract by making it unreasonably difficult to meet quota; and (3) discharging them for, in McCaskey's case, failing to meet quota, and in Mellen's and Luke's cases, refusing to agree to be bound by the full, unadjusted quotas.

CSAA contended that none of these theories presented an issue of fact for trial because (1) the statute of limitations expired before plaintiffs filed their complaints; (2) the at-will character of the employment entitled CSAA to fire plaintiffs regardless of its grounds for doing so; (3) CSAA in any case had good cause to do so; and (4) CSAA did not breach the contract by eliminating the MPR reductions, because it had satisfied the preconditions giving it the power to do so under the principles applied in *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1 [96 Cal.Rptr.2d 179, 999 P.2d 71] (*Asmus*). We do not find the summary adjudication of the contract claims sustainable on any of these grounds.

B. *Statute of Limitations*

The trial court sustained CSAA's limitations defense as to two of plaintiffs' three contract theories. The court understood CSAA to argue that the claims were governed by the four-year statute of limitations applicable to claims based on a written contract. (Code Civ. Proc., § 337, subd. 1.) Since plaintiffs' complaints were filed on June 9, 2005, the question presented was whether, as a matter of law, the limitations period began to run before June 9, 2001. Defendant argued, and the court concluded, that the period began to run on April 1, 2001, when defendant first adopted a compensation plan omitting the MPR reductions. Plaintiffs argued that this conduct was at most

an anticipatory breach, and that they sustained no compensable harm until defendant took detrimental *action* in violation of the alleged contract.

These contentions raise pure issues of law, which we will address without deference to the trial court's ruling.

■ CSAA relies on the "[g]eneral [r]ule" that a contract cause of action runs from the date of the breach. (3 Witkin, Cal. Procedure, *supra*, Actions, § 520, p. 664.) They contend that the claimed breach with respect to the elimination of the MPR reductions necessarily occurred on the effective date of the 2001 compensation plan, which omitted the provision allowing those reductions. But a breach of contract ordinarily occurs upon the promisor's *failure to render the promised performance*. Therefore, to pinpoint the time of an alleged breach for purposes of the statute of limitations, it is necessary to establish what it was the defendant promised to do, or refrain from doing, and *when its conduct diverged* from that promise. Here the alleged promise, reduced to essentials, was that CSAA would *permit plaintiffs to remain in its employ*—and thus to draw whatever other emoluments might accompany such employment—*under a relaxed sales quota*. Stated another way, it was a promise *not to fire them* for failing to meet the full quotas, so long as they met the relaxed ones. This was in one sense a promise of forbearance, i.e., to refrain from terminating plaintiffs' employment based upon underproduction; in another sense it could be viewed as a promise to treat them as if they were meeting quota even though they were only meeting the adjusted quota.

■ CSAA did not breach this promise merely by announcing that it would no longer honor it. As plaintiffs correctly observe, such a repudiation may constitute an *anticipatory* breach, giving the aggrieved promisee the *option* of suing immediately. (3 Witkin, *supra*, Actions, § 527, pp. 674–675.) But it does not accelerate the accrual of a cause of action for limitations purposes; the promisee remains entitled to wait until performance is due and the promisor has failed to perform, i.e., to do the thing promised. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489 [59 Cal.Rptr.2d 20, 926 P.2d 1114] (*Romano*); see *id.* at p. 488 ["A cause of action for breach of contract does not accrue before the time of breach."]; *Taylor v. Johnston* (1975) 15 Cal.3d 130, 137 [123 Cal.Rptr. 641, 539 P.2d 425] ["There can be no *actual* breach of a contract until the time specified therein for performance has arrived."].) Here CSAA could have no occasion to perform unless and until a qualifying agent's sales fell into the zone between the unadjusted quota and the reduced quota. Only then could CSAA be called upon to perform by honoring the latter, and only then could it breach the promise by failing to do so. Unless and until that occurred, defendant's renunciation of the promise was, at plaintiffs' election, an "empty threat" to breach the contract. (*Taylor v. Johnston, supra*, 15 Cal.3d at p. 137.)

■ In this light, the earliest arguable breach suggested by this record was some time in 2002 when CSAA first counseled plaintiff McCaskey for failing to meet MPR's. Since Mellen and Luke apparently never fell below the unadjusted MPR's, no arguable breach appears as to them before 2005, when they were actually discharged. But even in McCaskey's case the earliest arguable breach occurred well within the four years preceding the filing of his complaint.

CSAA seeks to avoid this logic by depicting the mere adoption of the 2001 plan as injurious to plaintiffs. Thus it describes that act as having "eliminated the . . . right to the [quota] reduction." Similarly, it alludes to the " 'right' CSAA took away" and "the remov[al] [of] a benefit [plaintiffs] previously had." These characterizations are inaccurate to the extent they are relevant, and irrelevant to the extent they are accurate. A promisor does not "eliminate" or "take away" the promisee's rights merely by announcing that he will not perform his promise. The promisee still has his rights; the promisor's announcement merely gives him the choice between suing immediately to vindicate his rights, and waiting to see whether the promisor will redeem himself when the time for performance comes. The promisor's repudiation deprives the promisee of no right and subjects him to no obligation; it merely *empowers* him to declare the contract breached and to seek recompense in court. Unless he exercises that power, the repudiation does not constitute a breach of contract in the eyes of the law, and cannot commence the running of the statute of limitations.

This rule seems particularly apt here, where the four years preceding plaintiffs' discharges were marked by an uneasy truce, or stalemate, in which each side insisted on its view of the contract while neither was willing to force the issue to a head, except as McCaskey could be said to have done so when he began to fall below the unadjusted quotas. When CSAA finally discharged him in flat violation of the policy, followed shortly by the discharge of Mellen and Luke for refusing to accede to its abolition, plaintiffs moved with alacrity to seek administrative and then judicial relief. To hold their claims barred would be to reduce the statute of limitations to a legally deadly game of maneuver rather than the protective rule of repose it is intended to be.

■ Similar reasoning establishes that the adoption of the 2001 plan, with its omission of the MPR reductions, inflicted no *compensable harm* on plaintiffs. As defendant concedes, the statute of limitations cannot ordinarily begin to run until "the plaintiff possesses a true cause of action," meaning that "events have developed to a point where the plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 614 [7 Cal.Rptr.2d 859] (*Marketing West*).) Defendant

offers no persuasive reason to suppose that this condition was satisfied here before plaintiffs were fired. The essential effect of the MPR reductions was to *shield plaintiffs from being discharged* so long as they met the reduced quotas. Had they sued over the mere repudiation of that shield, it is impossible to see how they could have shown any *injury*. They would still remain employed, and fully compensated, so long as they met the higher quotas applicable to all employees, as Mellen and Luke did, or still had an opportunity to do so, as McCaskey did under defendant's progressive counseling system. Therefore, CSAA's renunciation of the MPR reductions caused, and seemingly could cause, no remediable harm unless and until CSAA actually fired plaintiffs, or docked their pay, or otherwise inflicted an injury of a type that could translate into damages in an action for breach of contract. As it was, plaintiffs were fully compensated for their labors up to the day they were discharged, which was less than two years before they filed suit. Prior to that day there was no way of knowing when, or whether, defendant's renunciation of the policy would have any effect at all on their actual tenure or compensation. They might have continued to satisfy the unadjusted MPR's until they chose, or were forced by medical or other extrinsic necessity, to stop working entirely. In either event defendant's refusal to honor the MPR reductions would have proven harmless. For the same reason, they could not have fixed the proof of damages by voluntarily resigning.

CSAA cites *Marketing West, supra*, 6 Cal.App.4th 603, 614, for the proposition that the statute began to run when defendant presented plaintiffs with the 2001 plan modifications. To some extent this argument seems to overlap the contention, which we address below, that merely by continuing to work plaintiffs *accepted* the plan modifications, became bound by them, and thus suffered a legally cognizable injury if, as they insist, defendant had no right to impose them. The cited decision may indeed be understood to lend some weight to such a theory. The precise tenor of the plaintiffs' claims there is unclear, but they apparently alleged that the defendant employer had breached their employment contracts by discharging them without cause. The court held that their causes of action were barred, having accrued at an earlier time when the employer compelled the plaintiffs, under threat of firing, to sign a written agreement converting their employment relationship to one terminable at will. (*Id.* at pp. 608–609.) At this moment, said the court, the plaintiffs "were harmed by giving up their right to be terminated only for good cause." (*Id.* at p. 614.)

This analysis might be on point if plaintiffs here had signed the 2001 agreement and thereby acceded to the destruction of the promised rights. As it is, they explicitly refused to do so. Unless their rights were destroyed by some other means, they were preserved for another day. Nothing in *Marketing*

*West* suggests that the *attempted* imposition of a superseding agreement starts the statute of limitations running on a claim for breach of the previous agreement.

Indeed the court's treatment of the later agreement points to a discrepancy in its reasoning. If the plaintiffs there had predicated their claims on the employer's forcing them to sign the intermediate agreement, then it might well be that their claims would have accrued when that agreement was signed. But from the court's somewhat vague account it appears that their claims sounded in *wrongful discharge*. By logical necessity, then, the plaintiffs relied on a claimed breach of a promise not to discharge them without good cause. The only suggestion of such a promise is in the earlier agreement, which the employer clearly meant the later agreement to supersede. Thus a claim predicated on the earlier agreement necessarily presupposed that the later agreement was *ineffectual* to have the intended effect. If that was the case, the later agreement *inflicted no harm* on the plaintiffs, compensable or otherwise, and could not possibly commence the running of the statute of limitations. If, on the other hand, that agreement injured the plaintiffs, as the court supposed, by destroying their erstwhile right not to be terminated without cause, then they *had* no claim based on that earlier right; the promise sued upon was no longer in effect, and therefore could not have been breached, when they were fired. From a limitations perspective, a cause of action based on that theory had never accrued, and *could* never accrue.

In short, the later agreement could not inflict the harm on which the court predicated its holding unless it rendered the original promise *substantively unenforceable*. But if it did that, a claim based on the original promise failed on the merits. The net result of the court's analysis, seemingly, was to beg the truly dispositive question, which is whether the later agreement actually did excuse the employer from complying with the earlier one. If it did, the plaintiffs had no claim. If it did not, they had a claim. The statute of limitations had no proper place in either alternative.[5]

Even if we thought *Marketing West* was soundly reasoned, we would see no basis for extending it to the facts here, where plaintiffs never signed a superseding agreement. It is true that CSAA contends plaintiffs were bound

---

[5] In *Romano, supra*, 14 Cal.4th 479, 491, the Supreme Court hinted at the conundrum inherent in the *Marketing West* analysis, writing of that case that "at the time of the . . . threat to terminate employment, the defendant repudiated the earlier contract and the plaintiffs accepted the repudiation and entered into a superseding written contract. By the time of the actual termination of employment . . . the plaintiffs were performing under a written contract that provided for termination without cause. Therefore, the termination was not in violation of their current contract, but only of a contract that had been replaced by the new contract." The Supreme Court did not, however, take the further step of noting that this rendered the limitations analysis in *Marketing West* logically incoherent.

by the terms of the 2001 plan whether they signed it or not, but that contention is most appropriately addressed as a defense on the merits. To the extent it becomes a necessary component of the limitations defense, it renders that defense at best superfluous.

For purposes of the present analysis it must be supposed that defendant wrongfully repudiated its undertaking to permit qualifying employees to continue in its employ under a relaxed performance standard. To hold that this repudiation instantly gave rise to a cause of action, even though plaintiffs remained employed by defendant for most of the next four years and were fully compensated throughout that time in accordance with the contract—while making clear their refusal to accede to the attempted destruction of their rights—would unjustifiably penalize plaintiffs for giving defendant the opportunity to retract the repudiation if and when the issue of compliance actually arose. The statute of limitations is supposed to be a shield by which defendants are protected against stale claims, faded memories, and the nasty surprise of a long-dead grievance brought back to life. (See *Davies v. Krasna* (1975) 14 Cal.3d 502, 512 [121 Cal.Rptr. 705, 535 P.2d 1161].) It is not supposed to operate as a minefield on which meritorious claims are obliterated by technicalities. Nor is it a force of nature falling blindly on the diligent and indolent alike. It is an act of man and, as such, is supposed to reflect that faculty by which man distinguishes himself, when he does, from the rest of nature: his reason. To accept defendant's limitations defense here would dishonor that faculty.

C. *Breach: Discharge in Violation of Promise to Honor Reduced Quotas*

1. *Introduction*

Plaintiffs' chief claim of breach is that CSAA failed to perform a promise, which it held out to them continuously for some 28 years, to employ them, once they reached age 55 with 15 years in service, under a relaxed standard of job performance. It is undisputed that all three plaintiffs fulfilled the stated conditions before the promise was renounced, and by the time of their discharge had satisfied the conditions for a further reduction in quotas. None of them, however, was ever permitted to enjoy the reduced quotas, and each was eventually discharged either for falling below the unadjusted quotas, or for insisting upon the right to do so.

Defendant's motion for summary judgment, as it bore on the merits of this theory of recovery, could be understood to assert that (1) CSAA was entitled under the rule of *Asmus, supra,* 23 Cal.4th 1, to nullify the promised reductions without incurring contractual liability; (2) recovery is precluded by

defendant's contractually reserved rights to terminate the employment without cause and to modify the compensation plan; and (3) plaintiffs consented to the rescission of the MPR reductions, making it mutual, by continuing to work after CSAA adopted the 2001 compensation plan.

The trial court did not reach these arguments as independent grounds for its ruling, but did adopt at least the third, in substance, as part of its analysis of the statute of limitations defense. We find none of them sufficient to warrant judgment for CSAA as a matter of law.

### 2. *Power to Terminate Obligation*

Defendant does not dispute, at least for present purposes, that its adoption of the policy granting reduced quotas to senior agents gave rise to a contractual duty toward plaintiffs. Its chief contention is that it was relieved of that duty under the rule of *Asmus, supra*, 23 Cal.4th at page 6. The employer there had adopted a " 'Management Employment Security Policy' " committing it " 'to offer all management employees who continue to meet our changing business expectations employment security through reassignment to and retraining for other management positions . . . .' " (*Id.* at p. 7.) The policy stated that it would remain in effect " 'so long as there is no change that will materially affect [the employer's] business plan achievement.' " (*Ibid.*) Four years later the employer announced that "industry conditions" might require it to discontinue the policy. (*Ibid.*) About two years after that, the employer announced that it would terminate the policy in about six months. (*Ibid.*) The plaintiffs were laid off, apparently, at least two years after the employer declared the policy ended. (*Id.* at pp. 7, 18.) They brought suit in a federal district court, which granted summary judgment in their favor, holding that under the circumstances, the employer lacked the power to unilaterally end the retention policy. On appeal, the Ninth Circuit certified to the California Supreme Court the question whether, under California law, the employer's " 'unilaterally adopted policy,' " having " 'become a part of the employment contract,' " could "thereafter" be "unilaterally" "rescind[ed]" by the employer, "even though the specified condition has not occurred." (*Id.* at pp. 5–6 & fn. 2.)

A divided Supreme Court held that the employer could unilaterally terminate its duty to honor the policy provided certain circumstances were present: "An employer may unilaterally terminate a policy that contains a specified condition, if the condition is one of indefinite duration, and the employer effects the change after a reasonable time, on reasonable notice, and without interfering with the employees' vested benefits." (*Asmus, supra*, 23 Cal.4th at p. 6.)

CSAA contends that the principles applied in *Asmus* gave it "the right to unilaterally eliminate the MPR reduction." Plaintiffs contend that *Asmus* is inapplicable because the policy here was not subject to a condition of indefinite duration but instead took effect at a definite time, i.e., when plaintiffs reached age 55 with 15 years in service. Alternatively, they contend that their right to the reduced MPR's was a vested right not vulnerable to interference by CSAA. We find neither side's treatment of the case sustainable.

The general question before us is the same one presented in *Asmus*: how long must an employer honor a unilaterally adopted policy conferring an employment benefit? Beyond this, the two cases have little in common. In particular, the feature deemed most critical there was that the *only indication* of the intended *duration* of the employer's undertaking was its statement that it intended to grant the promised benefit as long as there was " 'no change . . . materially affect[ing]' " its " 'business plan achievement.' " (*Asmus, supra*, 23 Cal.4th at p. 7.) This was a " 'condition' " of "indefinite duration," the court reasoned, in that it "did not state an ascertainable event that could be measured in any reasonable manner." (*Id.* at p. 17.) Therefore the promise was one, in effect, to perform for an undefined period; as such it was terminable after a reasonable time. (*Ibid.*) By honoring the policy for six years, the court held, the employer had satisfied this condition. (*Id.* at pp. 17–18.) It was therefore entitled to terminate the policy on reasonable notice, and since it had done so, and its conduct infringed no vested right, it could not be liable to the plaintiffs in contract. (*Ibid.*)

Here the employer also failed to explicitly set an end date for its performance of the promise. But unlike the policy in *Asmus*, the employer's promise here, and the circumstances in which it was made, readily suggest an *implied-in-fact* durational term by which CSAA's duty to honor the policy would end, as to a qualifying employee, either (1) at age 65, (2) after 10 years, or (3) upon the employee's retirement. Such an intent is suggested, first, by the express terms of the promised benefit. A worker earned it only by continuing in CSAA's employment to age 55. At that point the worker would be entitled to a 15 percent reduction in MPR's *for five years*, i.e., to age 60, at which point a further 25 percentage point reduction would be granted, bringing the total reduction to 40 percent.[6] One reasonable interpretation of these provisions is that the second level of reductions was to be enjoyed for a

[6] A slight complication is introduced by the possibility that a worker might reach age 55 before accumulating 15 years in service, in which case he would qualify for the reduction only when the requisite years in service were achieved, and for the further reduction five years later. This is an entirely abstract possibility, so far as this record is concerned, but it is the reason for our acknowledging a potential issue whether, if the policy was intended to operate for 10

like period as the first, i.e., five years, so that the policy would operate to age 65, when the worker reached what might reasonably be viewed as the usual retirement age.

This view receives further support from the purpose of the policy, both from CSAA's point of view and that of employees. Although CSAA attempts to offer various other reasons for its adoption of the policy—which we discuss below in addressing the claims for employment discrimination—the most obvious function of the policy was to *induce sales representatives to remain in CSAA's employ for their entire working careers.* The record does not indicate the extent to which a representative's book of business might be "portable," i.e., might follow him to another insurance carrier were he to leave CSAA; nor does it indicate the rate at which his customers might migrate elsewhere on their own if and when the agent from whom they purchased their policies stopped handling their accounts. Whatever the particulars, the policy to all appearances was intended to, and did, induce persons in plaintiffs' position to remain loyal CSAA employees to the ends of their working lives. To do this it promised, in plaintiffs' words, to "ease" them "into retirement" by softening the demands of their jobs for the last stage of their careers. Such a benefit would only achieve this goal if it remained in effect until they might reasonably be expected to retire.

Indeed we see nothing in this record that would foreclose an interpretation under which the policy was intended to permit an agent to continue working under the reduced MPR's for as long as he or she was willing and able to do so. This would not produce the kind of perpetual, inescapable burden, potentially threatening an employer's very survival, that the courts feared in *Asmus* and cases cited there.[7] By its terms the policy could only operate as long as a qualifying agent remained able to meet quota, which was (after age

years, that time would run from age 55 or from the date of qualification. This issue has no direct relevance here, of course, since all three plaintiffs had well over 15 years in service when they reached 55.

[7] The court quoted with approval the dissent in *Demasse v. ITT Corp.* (1999) 194 Ariz. 500 [984 P.2d 1138, 1155] (dis. opn. of Jones, V. C. J.), which observed that " 'employers may be unilaterally forced by economic circumstance to curtail or shut down an operation, something employers have the absolute right to do. When the employer chooses in good faith, in pursuit of legitimate business objectives, to eliminate an employee policy as an alternative to curtailment or total shutdown, there has been forbearance by the employer. Such forbearance constitutes a benefit to the employee in the form of an offer of continuing employment. The employer who provides continuing employment, albeit under newly modified contract terms, also provides consideration to support the amended policy manual.' " (*Asmus, supra,* 23 Cal.4th at p. 14.) Here it is unclear that the MPR reductions represented a significant burden on CSAA at the time of their elimination. CSAA vice-president Newcomer testified in deposition that at the time the policy was eliminated, "I don't believe we had terminated anybody for minimum production requirements in the last 18, 24 months. And to my recollection there was not a large population of sales representatives, not even a small population of sales representatives, that were using this provision." Moreover, invocation of the provision required an agent to continue

60) 60 percent of the full quota. The policy thus permitted him only to slow down to that degree; he still had to produce the specified quantum of new business or be subject to discharge for underproduction. At some point the natural course of events would render that impossible, so that even the most loyal (or stubborn) agent would be forced to resign the position.

■ It is of course inappropriate for us to choose from among these potential interpretations of the contract. It is enough for present purposes that the structure of the benefit, coupled with its purpose, would readily yield a finding that the policy was to be honored *at least* until the agent qualifying for it reached 65. This possibility, if borne out at trial, will take the case outside the rule of *Asmus*, which applies only where there is no basis to determine the parties' *actual intent* as to duration.[8] That decision necessarily depends on such a condition, for where the parties' actual intent can be ascertained, it must govern. (See Civ. Code, § 1636.) The *Asmus* case implicitly acknowledged this fundamental principle, as applicable in the context of durational terms, by citing *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 731 [73 Cal.Rptr. 213, 447 P.2d 325] (*Consolidated Theatres*), for the crucial proposition that a contract of "indefinite duration" is "terminable after a reasonable time on reasonable notice." (*Asmus, supra*, 23 Cal.4th at p. 17.) Under *Consolidated Theatres*, and the principles enumerated there, a court may limit a contractual duty to a judicially determined "reasonable time" only after other tools of construction have failed to establish an *intended* duration.

The court in *Consolidated Theaters* described a three-stage inquiry in which the first step is the obvious one: to consult the contract itself. If it specifies the duration of the duty at issue, that will ordinarily end the matter. (Civ. Code, §§ 1638, 1639.) If the agreement does not plainly state when the duty will end, its duration must be "judicially determined in accordance with established rules of construction." (*Consolidated Theatres, supra*, 69 Cal.2d at

to sell enough new business to meet the reduced MPR's. His commissions on this new business, together with his renewal commissions, constituted the only direct compensation CSAA owed him. CSAA might save the renewal commissions by the termination of his employment, but would only save the new business commissions to the extent the same sales would be made through hourly employees rather than other commissioned agents. But for all CSAA could know, some of that business would be purchased from a competitor, marking a comparative *loss* as to employees who had already earned its benefits to CSAA. In sum, nothing in the record suggests that continuing to honor the policy would impose such a burden on CSAA that it might readily be thought to threaten its business.

[8] In a contract setting, of course, "actual intent" does not mean the parties' *subjective* intentions, but the intent objectively manifested by them through their words and actions. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 744, pp. 831–832, and cases cited.) A party's subjective understanding may of course become relevant to the resolution of contractual ambiguities, at least where it is known to the other party. (See Civ. Code, § 1649; cf. Rest.2d Contracts, § 201, subd. (2).)

p. 724.) The question then is "whether the intention of the parties as to duration can be *implied* from the nature of the contract and the circumstances surrounding it." (*Id.* at p. 725; original italics.) The first two steps seek, in other words, to ascertain the parties' actual intent, from circumstantial evidence if necessary. (See Civ. Code, §§ 1636, 1647.) If that succeeds, the intent thus found will govern. (See *Consolidated Theatres, supra,* 69 Cal.2d at p. 727.) However, "in some cases the nature of the contract and the totality of surrounding circumstances give no suggestion as to any ascertainable term. In such cases *the law usually implies that the term of duration shall be at least a reasonable time,* and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a reasonable time has elapsed." (*Id.* at pp. 727–728, fn. omitted, italics added.)[9]

In other words, the court first consults the terms of the contract; then the circumstances and other indicia of intent; and only when those steps fail to establish a durational term does the court impose a judicially determined "reasonable time" limitation on the duty at issue. This last step is a manifestation of the broader principle that when any essential term has been omitted from the contract, and the parties' intent concerning that term cannot otherwise be ascertained, the law will supply a *reasonable* term—provided the omission was not so grievous as to prevent the formation of a contract. (See Rest.2d Contracts, § 204; 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 751, pp. 841–842; cf. Civ. Code, § 1655.)

It follows that before it could properly rely on the "reasonable time" rule applied in *Asmus,* CSAA had to establish that no durational term could be derived from the terms and circumstances of the MPR reduction policy. It did not attempt such a demonstration. Given the facts to which we have already alluded, this failure was fatal to its claim that it was entitled as a matter of law to unilaterally nullify the policy as to plaintiffs.

Moreover, even if CSAA had established that the rule of *Asmus* governed the case, we fail to see how the present record can be read to conclusively establish that CSAA only sought to terminate the duty in question "after a reasonable time." (*Asmus, supra,* 23 Cal.4th at pp. 6, 17; see *id.* at pp. 11, 14.) The closest defendant came to acknowledging this question in the trial court was to observe that the policy "had been in place since 1973," i.e., for 28 years. But the question is not how long ago the promise was *made*; it is how long the promisor is *required to perform.* In *Asmus* these two periods were essentially coterminous, or at least commenced simultaneously, because the policy burdened the employer with a duty to the plaintiffs the moment it

---

[9] A version of this principle is codified in Civil Code section 1657, which provides in part, "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."

was announced—or more precisely, the moment it was accepted and made binding by the employees' continuing to work. (See *Asmus, supra,* at p. 10, quoting *Chinn v. China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98, 99–100 [291 P.2d 91] [noting trend in law to treat " 'offer [of] additional advantages to employees as being in effect offers of a unilateral contract which offer is accepted if the employee continues in the employment' "].) Because the policy offered in *Asmus* was of a type that could be performed immediately, it burdened the employer from the moment of its announcement forward until the employer could acquire, and exercise, the power to terminate the resulting duty of performance. Thus, in commenting on how long the policy had been "in place" and "maintained," the *Asmus* court was also describing how long the resulting duty had been *performed.* The employer had performed the promise for six years, and apparently could not be said to have actually *breached* it—by laying off the plaintiffs—until some two years after that, eight years after performance commenced. In essence, the court held, the employer had carried the burden of its promise long enough.

The facts here differ starkly. So far as this record shows, CSAA assumed no immediate burden by announcing the MPR reductions. It assumed no general immediate obligation to an entire class of workers. It obligated itself to do nothing until a worker fulfilled the policy's conditions by remaining for at least 15 years and approaching the typical retirement age. CSAA thus received the immediate benefits of a loyal, stable workforce, solely on the promise of a *future* reward.[10] Then, shortly after plaintiffs qualified for the promised benefit—and before any of them actually sought to take advantage of it—defendant renounced the duty to perform it.

Although it is conceivable that additional facts, not reflected in this record, might sustain a different conclusion, nothing before us would permit a court to conclude that a "reasonable time" had passed, at least as to plaintiffs, so as to permit defendant to repudiate their undertaking without contractual liability. Determining what constituted a reasonable time under the circumstances would seem to require consideration of the facts we have already noted, i.e., that the benefit is readily understood as a way to ease plaintiffs into retirement, that plaintiffs had in fact devoted their careers to CSAA's service in anticipation of the benefit, and that CSAA had therefore received everything it bargained for while yielding nothing whatever in return.

---

[10] See *Chinn v. China Nat. Aviation Corp., supra,* 138 Cal.App.2d at page 100, quoting *Roberts v. Mays Mills* (1922) 184 N.C. 406 [114 S.E. 530, 532, 28 A.L.R. 338] (" 'It has become a very general policy with large employers of labor to offer a bonus or additional compensation to employees who shall render continuous and efficient service for a specified period of time. This is not a gratuity or gift, but is an offer on the part of the employer, with whom the offer originates in order to procure efficient and faithful service and continuous employment, and when the employee enters upon the service upon that inducement it becomes a supplementary contract of which he cannot be deprived without sufficient cause. [Citations.]' ").

So understood, it would seem patently unreasonable to refuse the promised benefit when CSAA did. If there is any sense in which CSAA *ever* actually *performed* the promised duty as to plaintiffs, it was only in the purely hypothetical sense that there was a period between their 55th birthdays and the cancellation of the policy when plaintiffs *could* have invoked it if they had chosen to do so. Even that purely theoretical benefit was short lived. Mellen and McCaskey had only reached their 55th birthdays about two years, and Luke only five *months*, before CSAA renounced the policy. The record contains no evidence concerning the extent to which CSAA may have honored the policy as to other agents, and we therefore need not consider the relevance of such evidence. On this record there is simply no basis to conclude that CSAA had honored the policy for a reasonable time when it renounced its undertaking, denied plaintiffs its benefits, and ultimately discharged them for invoking it.

The order granting summary judgment on the contract claims cannot be sustained on the authority of *Asmus*.[11]

### 3. *Effect of At-will and Revision Clauses*

CSAA contends that because plaintiffs' employment was terminable at will, no liability could be predicated on discharging them for failing to satisfy, or agree to, the full production quotas. Plaintiffs reply that their employment was not terminable at will, despite express recitals to that effect in the various appointment agreements and employee handbooks promulgated by defendant over the years. CSAA responds that plaintiffs' argument rests at best on implied terms, which cannot be permitted to vary the express terms of the contract, and that in any event there was good cause to terminate plaintiffs' employment. CSAA also notes that it expressly reserved the right to modify the terms of the compensation plan, which is all it did when it abolished the MPR reductions.

---

[11] This analysis makes it unnecessary to consider the further question posed by *Asmus*, which is whether the defendant's conduct interfered with a "vested" right. To "vest" a person with a right or interest is "[t]o give [him] an *immediate, fixed* right of present or future enjoyment." (Black's Law Dict. (9th ed. 2009) p. 1699, col. 1, italics added; see *In re Marriage of Justice* (1984) 157 Cal.App.3d 82, 87, fn. 6 [204 Cal.Rptr. 6] ["In dissolution cases, the term 'vested' refers to a pension right which is not subject to a condition of forfeiture if the employment relationship terminates before retirement."].) The essential meaning is "irrevocable" or "nonforfeitable." So viewed, the question whether the right to an employment benefit is "vested" seems largely if not entirely congruent with the question whether the employer is free to revoke it. That in turn, as we have seen, depends on the duration of the employer's obligation as expressed in, or implied under, the contract. Here, when plaintiffs reached age 55 with 15 years in service, and with the reduced MPR policy still in effect, they had an immediate irrevocable right to enjoy the benefits of that policy for some period of time, as discussed above. To that extent the right appears "vested." However it seems to add little to the analysis to say so. There may be cases where the vested rights issue adds an important and useful element to the analysis. But this does not appear to be one of them.

We do not find satisfactory either side's framing of the issues. The key terms of the parties' agreement, as presently relevant, were that plaintiffs would work for CSAA for so long as both parties were satisfied with the arrangement; that CSAA would compensate plaintiffs in accordance with the compensation plan, which it reserved the right to modify at any time; and that if plaintiffs continued to work for CSAA to age 55 they would be entitled to remain employed under a relaxed production quota. As framed by the parties, the question is whether to give effect to their express affirmations that the employment was terminable at will. But this sweeps too broadly. It may indeed be true, and can in any event be assumed for present purposes, that the employment was "at will" in the sense that CSAA was generally entitled to discharge plaintiffs without having to establish good cause to do so. It does not follow, however, that it could discharge them—as it explicitly did—for failing to meet production quotas after they had qualified for the promised reductions, or for refusing to relinquish the right to those reductions. The governing question is not CSAA's general power to discharge plaintiffs without cause, but its power to discharge them, as it expressly did, *for a reason it had promised not to use* as a basis for their discharge.

■ This view depends not on implied terms but on harmonizing express ones. A contract is to be construed as a whole, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) And where there are "[s]everal contracts relating to the same matters, . . . and made as parts of substantially one transaction," they "are to be taken together." (Civ. Code, § 1642.) Here, the at-will clause and the promise of MPR reductions must be read together as parts of a single contract. If the at-will clause empowered CSAA to discharge employees for failing to meet the full quotas, notwithstanding their having qualified for the reduced ones, it would render the promise of reduced quotas wholly illusory. This would deny effect to that promise, offending the principle that where two provisions conflict, the resulting "[r]epugnancy . . . must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract." (Civ. Code, § 1652; see *id.*, § 1643 [contract should "receive such interpretation as will make it . . . operative . . . and capable of being carried into effect, if it can be done without violating the intention of the parties"]; cf. *id.*, § 1653 [terms found to be "wholly inconsistent" with contract's "nature, or with the main intention of the parties, are to be rejected"].) Here the conflict can be resolved by reading the MPR reductions as an exception to the general rule of at-will employment. In that view, the contract may permit CSAA to discharge plaintiffs for no reason, or even for a bad reason, but it does not permit their discharge for the reason that they had invoked, or insisted on the right to invoke, the MPR reductions.

Similarly, the reserved power to modify the compensation plan does not pose an insuperable barrier to plaintiffs' recovery because it can easily be understood as qualified by the obligation to honor the promise of reduced MPR's as to those representatives who had qualified for it—i.e., earned it—while it was still in effect. We do not understand plaintiffs to contend that they were entitled to the actual MPR's in effect before the 2001 plan was adopted. Defendant remained free to revise the plan as a whole. For that matter, so far as plaintiffs were concerned, defendant was free to drop the MPR reductions as they might otherwise apply in the future to employees who had not yet qualified for them. But defendant was not free to eliminate them as to plaintiffs without satisfying the conditions set forth in *Asmus*, including that plaintiffs be permitted to enjoy the benefits thus earned for the time contemplated by the parties, or if none can be established, for a reasonable time.

### 4. *Consent by Continuing to Work*

█ Defendant contends that whatever effect might otherwise have flowed from its renunciation of the promise of reduced MPR's, plaintiffs consented to the rescission of that promise by continuing to work after CSAA renounced that promise and told plaintiffs, through counsel, that it considered them bound by the full quotas. Defendant relies on *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 636 [69 Cal.Rptr.2d 300] (*DiGiacinto*), which applied the general rule that when an employer announces new terms of employment, the announcement constitutes a unilateral offer of employment on the new terms, which the employee accepts by continuing to work. The same rule played an integral role in *Asmus*, because it was the mechanism by which the retention policy there became contractually binding on the employer. (*Asmus, supra,* 23 Cal.4th at pp. 9–11.) As explained in *DiGiacinto*, however, the rule depends on the at-will character of the employment: "[A]s a matter of law, an at-will employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions." (*DiGiacinto, supra,* 59 Cal.App.4th at p. 637.) The rationale is that the announcement of new terms "constitutes, in legal effect, both *the termination of the old contract* and the offer of a new contract." (*Ibid.,* italics added.) It follows that if the employer was not free to terminate the old contract, the worker cannot bind himself to its abrogation merely by continuing to work, at least where he makes explicit his lack of assent to the new terms.

Here, as discussed above, when CSAA announced the contested terms it was already—so far as this appeal is concerned—under an obligation not to discharge plaintiffs for failing to meet production requirements, unless they

fell below requirements as reduced in accordance with the pre-2001 policy. The rationale adopted in *DiGiacinto* therefore has no application. The court there noted that some courts had reached a result similar to its own by equitable rules such as estoppel. (*DiGiacinto, supra*, 59 Cal.App.4th at p. 636, citing *Facelli v. Southeast Marketing Co.* (1985) 284 S.C. 449 [327 S.E.2d 338, 339] and *Nichols v. Waterfield Financial Corp.* (1989) 62 Ohio App.3d 717 [577 N.E.2d 422, 423].) But those rationales would fare even worse here, since there is no basis to find either that plaintiffs' conduct was inequitable or that CSAA's was equitable. In contrast to *DiGiacinto* and some of the cases there cited, plaintiffs' conduct was entirely unequivocal. They positively asserted the continuing right—which CSAA's argument on this point assumes—to the reduced quotas. CSAA could not have been misled. Plaintiffs' continuation in employment was no stronger a basis to bind them to CSAA's interpretation of the contract than CSAA's continuing to employ them was the reverse.

Moreover, unlike the employer in *Asmus*, CSAA sought plaintiffs' express consent to the modifications it sought to impose. Plaintiffs—through their attorney—explicitly refused to give that consent. The plaintiff in *DiGiacinto* also apparently refused to sign a document acknowledging the new terms, but since his employment was entirely at will he was powerless to refuse the employer's terms; his only choices were to come to work on the stated terms, or stop coming to work. His situation with respect to the modified wage was no different than that of a brand new employee who first appears on the job declaring that he expects to be paid twice what the employer had offered him. There is no mechanism by which such an announcement can ripen into a contract unless the offeror somehow assents to it. If the employee nonetheless commences work he has either accepted the employer's terms or, perhaps, taken himself entirely outside the contract, so as to be entitled only to relief in equity, or to no relief, for the services he performs. But all this assumes that the employer was free to dictate the terms on which the work would be done, if done at all. Here, the employer was not free—or at least has not been shown to have been free—to discharge the workers for refusing to accede to the new terms. Therefore the rationale underlying the result in *DiGiacinto* does not apply.

This case may be further distinguished from *DiGiacinto* and other cases cited by defendant on the ground that the rights at issue here, when promised, would by their nature only accrue in the future, whereas the right the plaintiff claimed in *DiGiacinto*—to be paid at the rate specified in his original employment agreement—accrued only as he worked. Nothing in the facts suggests that the plaintiff had been promised, or had earned, a right to any particular salary for *future* work; his right to any particular salary was fixed only as to work he had already performed. Here plaintiffs contend that CSAA was under a duty which it must perform for either a time derived from the

contract, or for a reasonable time. It was only free to stop performing the posited duty after that time had elapsed. It could not shed that obligation by the simple expedient of compelling employees who earned the benefit to quit and sue. *DiGiacinto* would have more nearly resembled this case if the employer had promised to pay a stated wage *for a specified time*, and had attempted to alter the pay rate before that time had elapsed. In that case, it is far from clear that the employee, merely by reporting to work, would accede to a rescission of the employer's original undertaking—particularly if he did what plaintiffs did here and explicitly asserted the right to be paid at the originally promised rate. In those circumstances the worker would have been quite right to contend, as he did, that he was entitled to mitigate damages by continuing to work under protest, and to sue later for the shortfall in compensation. As it was, he had no entitlement to any particular salary going forward and his mere failure to expressly accede to the employer's modification was ineffectual to prevent it from taking effect.

### D. *Breach: Termination Without Cause*

Plaintiffs' second contract theory is that their employment was terminable only for cause and that defendant lacked the requisite cause, such that the termination of plaintiffs' employment was a breach of contract. The trial court ruled that there was no triable issue of fact on either of these points—that as a matter of law, plaintiffs' employment was terminable at will, and defendant had good cause to terminate it. As we have already held, the most plausible interpretation of the contract on the present record is that although CSAA had the general right to terminate the employment without cause, that right did not extend to terminating plaintiffs *for underproduction* so long as they conformed to the relaxed quotas CSAA had promised them. There is no dispute that CSAA discharged plaintiff McCaskey for failing to satisfy the unadjusted quotas, and discharged plaintiffs Luke and Mellen for refusing to agree to comply with those quotas. The contract can be understood as prohibiting CSAA from discharging them for that conduct. Thus, while the case really does not fit within the framework of a typical discharge-without-good-cause claim, plaintiffs have presented a colorable claim that defendant violated a promise not to discharge them for the reasons which actually led to their discharges.

### E. *Interference with Performance*

Plaintiffs' third breach-of-contract theory is that defendant breached the employment contract by "unreasonably interfering with [plaintiffs'] job responsibilities." The gist of this claim, as we understand it, is that defendant made it unreasonably difficult for plaintiffs to perform their contracts, i.e., to meet the quotas they were required to meet, by diverting sales opportunities

away from them by means such as establishing an in-house staff of order takers, giving them priority on incoming calls, redirecting plaintiffs' callers to the order takers, permitting the order takers to solicit plaintiffs' existing clients, and making direct sales via the Internet.

The legal principle underlying the claim is that "[p]revention or hindrance of performance operates not only as an excuse for the [promisor's] performance [citations], but is also a breach, giving that party the affirmative remedies for breach. [Citations.]" (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 851, pp. 937–938.) We question the applicability of this principle to the facts alleged by plaintiffs, but we have no occasion to examine the question further because CSAA offered no challenge to this theory in the trial court other than to lump it together with plaintiffs' other contract claims and assert that all were barred by the statute of limitations. The trial court agreed, but without acknowledging the quite different facts on which this claim is based. Defendant seeks to defend this approach on appeal by asserting that all of the claimed acts of interference "were merely aspects of the 2001 [Compensation] Plan," which CSAA was entitled to adopt, and to which plaintiffs acceded by continuing to work. Defendant asserts more specifically that the "terms" plaintiffs accepted by continuing to work after 2001 "included fixed 'sales quotas' . . . , redirection of renewal calls to 'call centers' . . . , and increased internet sales."

We have already rejected the limitations defense on grounds that seem equally applicable here. Likewise we have rejected the contention that plaintiffs bound themselves to the 2001 plan merely by continuing to work. Moreover, we detect no substance in CSAA's attempt to depict the challenged measures as contractual "term[s]" to which plaintiffs did or could assent. CSAA attempts to justify this characterization by stating parenthetically that an "aspect of the 2001 Plan" was "to relieve representatives of renewal work and encourage the development of new business." But this statement, and CSAA's entire argument on this point, conflates its *business strategy* with the parties' *contract* by using the term "plan" to refer to both. This is made possible only because CSAA has traditionally entitled its commission schedule, and associated terms, the "Compensation Plan." In the earlier parts of its brief CSAA uses the phrase "2001 Plan" repeatedly—more than two dozen times, in fact—to mean the 2001 compensation plan. It is only in discussing the interference claim that CSAA uses "2001 Plan" to mean what its witness, Newcomer, referred to in deposition as a "business model," "sales model," or "distribution model," which was apparently intended to place increasing reliance on call centers and direct marketing through media including the Internet. There is no suggestion that anything arguably part of plaintiffs' employment agreement with CSAA so much as *alluded* to this "model" or otherwise called upon signatories to accede to the conduct that forms the basis for plaintiffs' interference claim. That CSAA

managers may have seen some connection between their "distribution model" and their agreements with plaintiffs could hardly make the former part of the latter. So far as this record shows, CSAA's business strategy has nothing whatever to do with any contract issue.

Defendant also seeks to justify the lumping together of plaintiffs' contract theories on the ground that "plaintiffs' 'interference' and 'vested rights' theories . . . both centered around a single occurrence: implementation of the 2001 Plan with its elimination of the MPR reduction." In other words, the interference claim stands or falls with the discontinuation-of-benefits claim because both arose from the "implementation" of the 2001 plan. Again, this assertion conflates the contract with some larger business strategy. Nor do we see any inherent relationship between the two contract theories. The gist of the interference claim is that CSAA drew potential customers away from plaintiffs and thereby made it unreasonably difficult for plaintiffs to meet their quotas. Such a claim does not logically require, and can be easily distinguished from, the elimination of reduced quotas. Indeed it may be understood to *assume* that plaintiffs were bound by the full quotas but that defendant prevented their performing the resulting duties. In any event the parties' contract appears to have been utterly silent as to the conduct at issue and thus cannot sustain the summary adjudication of this claim.

## II. *Age Discrimination*

### A. *Statute of Limitations*

Plaintiffs alleged that CSAA's conduct towards them was actionable under FEHA on three distinct theories: disparate treatment, disparate impact, and unlawful retaliation. Before getting into the substance of these claims, we must address the defense argument, which the trial court adopted, that "[t]o the extent" the disparate treatment and disparate impact claims were predicated on defendant's "unilaterally implementing the 2001 Compensation Plan," they were "barred by the statute of limitations for the same reasons that plaintiff's first two breach of contract claims are barred." This ruling is troublesome on its face in two respects. First, there can be no summary adjudication of less than an entire cause of action. (Code Civ. Proc., § 437c, subd. (f)(1) ["A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."].) Therefore, an order granting summary adjudication "to the extent" a cause of action rests on this or that premise is invalid unless the matter thus adjudicated is properly viewed as a distinct "cause of action" for purposes of the provision thus cited. If a cause of action is not shown to be barred in its entirety, no order for summary judgment—or adjudication—can be entered.

■ Second, the operation of the statute of limitations varies depending on the nature of the claim under scrutiny. That a contract cause of action is (or is not) barred does not mean that a FEHA cause of action is (or is not) barred. Here, as we have concluded, the statute of limitations did *not* bar the contract cause of action. It does not follow, however, that it did not bar the FEHA causes of action. Unfortunately, neither the parties nor the court gave the latter question the independent attention it requires.

The statute of limitations generally at issue in FEHA cases governs not the time for filing suit, as such, but the time for filing an administrative complaint with the Department of Fair Employment and Housing.[12] This is because in the absence of a timely administrative complaint, any civil action alleging a violation of FEHA will be subject to dismissal for failure to exhaust administrative remedies. (See *Romano, supra*, 14 Cal.4th at p. 492 ["The timely filing of an administrative complaint is a prerequisite to the bringing of a civil action for damages under the FEHA."].) The applicable statute provides that, in general, "[n]o complaint may be filed" with the department "after the expiration of one year from the date upon which the alleged unlawful practice . . . occurred." (Gov. Code, § 12960, subd. (d).)

The leading case on the application of this statute is *Romano, supra*, 14 Cal.4th 479, in which the Supreme Court concluded that a claim brought within one year of the plaintiff's termination was timely despite the employer's having given notice well outside the one-year period of its intention to discharge the plaintiff. The court noted that the discharge was the only act complained of by the plaintiff that was made actionable by FEHA. (14 Cal.4th at pp. 491–492, citing Gov. Code, former § 12941, subd. (a); see now Gov. Code, § 12940, subd. (a).) "Accordingly," the court reasoned, the discharge was "the relevant unlawful practice for the purpose of the statute of limitations." (*Romano, supra*, 14 Cal.4th at pp. 492–493.) To interpret FEHA to require a claim within one year of *notice* of discharge would conflict with (1) its plain meaning, (2) its "remedial purpose," which is "to safeguard the employee's right to seek, obtain, and hold employment without experiencing discrimination," and (3) the legislative directive that the act be liberally construed to effectuate that purpose. (14 Cal.4th at p. 493; see Gov. Code, § 12993, subd. (a).)

■ The court found support for its reading of FEHA in the decisions of courts in sister states. (*Romano, supra*, 14 Cal.4th at p. 495.) It acknowledged that federal courts had read the corresponding federal act differently, but it

---

[12] Doubtless a civil action based on FEHA violations is also subject to the statute of limitations generally requiring that claims founded on a statute be brought within three years. (See Code Civ. Proc., § 338, subd. (a).) As a practical matter, however, plaintiffs are more likely to run afoul of the administrative limitation than the civil one.

declined, for several reasons, to follow their lead. (*Id.* at pp. 495–499, citing, inter alia, *Delaware State College v. Ricks* (1980) 449 U.S. 250 [66 L.Ed.2d 431, 101 S.Ct. 498] and *Chardon v. Fernandez* (1981) 454 U.S. 6 [70 L.Ed.2d 6, 102 S.Ct. 28].) While California courts have often followed federal precedent in applying antidiscrimination laws, they are by no means obliged to do so. (See *Romano, supra,* 14 Cal.4th at pp. 497–498.) The federal statute is distinguishable from FEHA in relevant respects. (*Romano,* at p. 498.) More importantly, the court "question[ed] the soundness of the reasoning" underlying the federal approach, quoting Justice Brennan's observation that the treatment adopted in a leading case had " 'no analogue in customary principles of limitations law' " and would operate to " 'increase the number of unripe and anticipatory lawsuits in the federal courts—lawsuits that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy.' " (*Romano, supra,* 14 Cal.4th at pp. 497–498, quoting *Chardon, supra,* 454 U.S. at pp. 6, 9 (dis. opn. of Brennan, J.).)[13]

The holding of *Romano* strongly suggests, if it does not compel the conclusion, that plaintiffs' time to file a FEHA claim ran from the termination of their employment and not from any earlier event. Defendant makes no cogent argument to the contrary. It merely refers us to its arguments on the contract cause of action—which we have already rejected—and reiterates the highly equivocal point, which the trial court adopted, that "any discrimination claims based on events before April 2004 (e.g., matters concerning the 2001 plan implementation) were time-barred." But on the face of their complaints plaintiffs' claims at least include, if they do not rest largely or entirely on, the termination of their employment, which took place well within the one-year period.

 The statute of limitations is a bar to liability, not a rule of evidence. The fact that a plaintiff's discharge may be causally related to some earlier discriminatory conduct does not mean that the discharge cannot form the basis for a cause of action. In the absence of a more cogent demonstration than defendant has made, the limitations defense is facially insufficient to support the orders under review.

---

[13] Despite the chorus of disapproval from state courts and commentators, the federal courts persisted in their parsimony, which reached its fullest expression in *Ledbetter v. Goodyear Tire & Rubber Co.* (2007) 550 U.S. 618 [167 L.Ed.2d 982, 127 S.Ct. 2162]. In January 2009, Congress "overturned *Ledbetter* as undermining long-established principles of American law and 'at odds with robust application of the civil rights law that Congress intended.' See Lilly Ledbetter Fair Pay Act of 2009, Pub.L. No. 111-2, 123 Stat. 5 (2009), amending 42 U.S.C. § 2000e-5[e] at Sec. 2, Findings (1) and (2)." (*Darensburg v. Metropolitan Transportation Com.* (N.D.Cal. 2009) 611 F.Supp.2d 994, 1040, fn. 4.)

### B. *Disparate Impact*

The gist of a disparate impact claim is that "a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, . . . had a disproportionate adverse effect on members of [a] protected class. [Citations.]" (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 354, fn. 20; see *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1418 [60 Cal.Rptr.3d 719].) For purposes of an age discrimination claim, the protected class is persons over 40 years of age. (Gov. Code, § 12926, subd. (b).)

Plaintiffs alleged in essence that the withdrawal of the MPR reductions had a disparate impact on workers over age 40. On its face this is certainly true; indeed, because the MPR reductions operated only in favor of persons at least 55 years old, the *only* persons directly and immediately affected by their elimination were members of the protected class. However plaintiffs have made no attempt on appeal to demonstrate that the summary adjudication of this claim constituted error. In their opening brief they barely mentioned disparate impact claims. In their statement of facts they asserted—apparently quoting their complaints, though without record citations—that the quotas imposed upon them by withdrawal of the former policy "creat[ed] a 'disparate impact on employees over the age of forty with large portfolios.' " Later, in introducing their legal argument on the discrimination claims, they observed that they had asserted claims for "both 'disparate treatment' and 'disparate impact' based on age." But the ensuing discussion addresses only the burden-shifting analysis applicable to " 'claims of discrimination, including age discrimination, based on a theory of disparate *treatment.*' " (Italics added.) (Quoting *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th 317, 354; see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817].)

In response, CSAA asserted that the disparate impact claims had been "abandoned 'for lack of appellate argument.' " (Quoting *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 278 [54 Cal.Rptr.3d 116].) Plaintiffs did not meet this objection, or even acknowledge it, in their reply brief. Nor did they defend the disparate impact claims as such, though they did argue, in the context of their retaliation claims, that they *reasonably believed* CSAA's actions inflicted an unlawful disparate impact. They also cited the supposed disparate impact of defendant's actions as circumstantial evidence of discriminatory intent. These oblique statements furnish no reason to overlook the general rule that reviewing courts will not address claims of error first made in the reply brief. (See 9 Witkin, Cal. Procedure, *supra,* Appeal, § 723, p. 790.) We conclude that plaintiffs have abandoned their

disparate impact claims and that the order granting summary adjudication must to that extent be sustained.

### C. *Disparate Treatment*

#### 1. *Analytical Framework*

 FEHA makes it unlawful to take adverse action toward an employee "because of" his or her membership in a protected classification. (Gov. Code, § 12940, subd. (a); see *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748 [52 Cal.Rptr.2d 620] ["An employer will be liable for intentional discrimination if it is shown that its employment decision was premised upon an illegitimate criterion."], citation omitted.) A claim asserting a violation of this provision is a "disparate treatment" claim. We have previously identified the elements of such a claim as "(1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the discriminatory animus and the adverse action; (5) damage to the employee; and (6) a causal link between the adverse action and the damage." (*Mamou, supra,* 165 Cal.App.4th 686, 713.)

 Here, as in most disparate treatment cases where the employer seeks summary judgment, the only elements in serious contention are the existence of discriminatory animus and a causal link between it and the challenged action. Proof of these elements "is likely to depend on circumstantial evidence, since they consist of subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action. Given the resulting difficulties of proof, the courts have fashioned a special presumption shifting the burden of production—but not persuasion—to the employer upon a prescribed showing by the plaintiff. Specifically, the employee 'may raise a presumption of discrimination by presenting a "prima facie case," the components of which vary with the nature of the claim, but typically require evidence that "(1) [the plaintiff] was a member of a protected class . . . , (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory . . . motive. [Citations.]" (*Guz* [*v. Bechtel National, Inc.*], *supra,* 24 Cal.4th at p. 355.) A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff. (*Ibid.*) However the employer may dispel

the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. (*Id.* at pp. 355–356.) At that point the presumption disappears. (*Id.* at p. 356.)' (*Reeves* [*v. Safeway Stores, supra,* 121 Cal.App.4th] at pp. 111–112; see *McDonnell Douglas Corp. v. Green*[*, supra,*] 411 U.S. 792, 802–804 . . . .)" (*Mamou, supra,* 165 Cal.App.4th at pp. 713–714.)

CSAA's argument for summary adjudication of the disparate treatment claim assumed that plaintiffs had made a prima facie case, but asserted that the challenged actions had nondiscriminatory motives. Plaintiffs sought to raise a triable issue of fact by presenting evidence on this point. The trial court, after sustaining certain evidentiary objections, found no triable issue of fact. The critical question before us is whether this determination was correct.[14] Since it presents a pure question of law, we review it without deference to the trial court's ruling.

### 2. *Obsolescence*

To establish a nondiscriminatory motive for plaintiffs' discharge, CSAA relied primarily on the declaration and deposition of sales and marketing vice-president Matthew Newcomer, who was the senior member of a "compensation plan team" that produced the 2001 compensation plan eliminating the reduced MPR's for senior sales agents. His proffered rationale for this action can be reduced to three points. The first is that the policy granting lower MPR's to senior sales agents was "obsolete." Its original purpose, he declared, was twofold: "to give tenured Sales Representatives the option of devoting more of their work time to conducting renewal transactions and servicing their renewal book of business than to developing new business," and "to give Sales Representatives a break on their [quota] in the event they needed time off for health-related reasons."[15] The second function had been largely superseded, he suggested, by state and federal medical leave legislation enacted in the 1990's, which "provided relief to employees who needed

---

[14] CSAA couches this question in terms of plaintiffs' ability or inability to "establish pretext." We have previously lamented the judicial tendency to let the pretext tail wag the discriminatory animus dog. (*Reeves v. Safeway Stores, Inc., supra,* 121 Cal.App.4th 95, 111, fn. 11; see *Mamou, supra,* 165 Cal.App.4th 686, 715 [stating ultimate issue in terms of pretext "muddie[s] the waters"].)

[15] He also declared that "[t]he MPR Reduction was a reallocation of tasks during the work day" and that "it conferred no financial benefit to the Sales Representatives." The first assertion is scarcely intelligible, and to the extent it means anything, appears false. The policy did not merely rearrange a qualifying agent's workday—indeed it is difficult to see how it did that—but it allowed him to *work less* without running afoul of the MPR's. The second clause is true only if letting someone keep his job "confer[s] no financial benefit."

to miss work for medical reasons." As to the first function—accommodating the increased burden imposed by renewal requirements on agents with large books of business—he made no attempt to quantify this burden in terms of the hours typically consumed, or otherwise. He averred only that CSAA eased the burden in the mid-1990's and eliminated it by 2004. As a result, he declared—again with no attempt at quantification—"[t]ime spent . . . on renewals was going down, not up."[16] As a further result, "[v]irtually none of the Sales Representatives used" the reduced MPR policy.

A jury could quite reasonably find this explanation unworthy of belief on its face. If the policy was really just an accommodation to the increased customer service demands of a large book of business, it was both underinclusive and overinclusive. It granted no relief to exceptionally productive younger workers who might amass a large book of business before reaching the qualifying age, or who came to CSAA later in their careers and had not accumulated the requisite time in its service. At the same time, the benefit was extended to all agents who met the age and service criteria, regardless of the size of their books of business. If the goal was merely accommodation, in other words, it would have been achieved much more simply and effectively by a policy based solely upon the size of an agent's book of business.

Nor does the policy appear particularly well suited to accommodating the health-related exigencies older workers might be expected to face. It eased their workload in times when they were healthy and granted only partial relief in times when they were not. A fact finder could also reasonably disbelieve the implication that the family leave legislation cited by Newcomer provided, or could genuinely be expected to provide, a level of protection comparable to that afforded by the reduced MPR's. In particular, plaintiff McCaskey declared that issues of health—his own and his wife's—played a central role in his inability to meet the unadjusted MPR's, contributing to the shortfall for which he was fired. Had he been able to invoke the reduced MPR's, he would not have been fired—at least not for the reasons cited by CSAA.

---

[16] Newcomer testified to similar effect in deposition: Whereas sales representatives had once been responsible for "service work," the company had reduced the burden of such work "by expanding our call center hours, creating a call center circa '92, '93, amending our business rules for requirements of securing permission to renew an account, amending our policies and procedures to advocate automatic renewal of accounts."

In an apparent attempt to contest Newcomer's account, each plaintiff declared, "Renewal calls are typically not productive sources for sales that would satisfy MPR requirements or otherwise. In large part, they are busy work, which is why they were eliminated in the early '90s and automatic renewal practices imposed." If we accept this statement as true for the moment, it does not seem effectual to contradict Newcomer's implication that renewal activities took up a considerable amount of an agent's time and that the reduced MPR's were intended in part to recognize this additional burden accompanying a large book of business.

A more obvious explanation for the policy is one to which we have already alluded in connection with the contract claims: it was a future reward intended to induce sales agents to remain loyal employees of CSAA for their entire careers. In this view, the promised reduction in quotas was a carrot dangled before them to help keep them in harness and dissuade them from straying elsewhere—and perhaps taking some of their clients with them, or at least risking the clients' attrition due to the loss of their accustomed point of contact with CSAA. Although plaintiff's expert, Westin, did not address the point directly, he seemed to imply that in-house sales agents like plaintiffs may be expected to switch employers with some frequency. He declared, "It is my opinion that it is highly unusual to find anyone who has been continuously employed by the same company as a sales representative for over 33 years. Plaintiffs clearly demonstrated their loyalty to CSAA through the remarkable number of years of their tenure." He also declared that it was "the common practice within the insurance industry" to "provide preferential treatment" to employees with seniority comparable to plaintiffs', "particularly those with exceptionally large and profitable books of business, when addressing changes relating to adjustments in commission rates and the establishment of sales quotas." This testimony, to which no meritorious objection was made, raised a triable issue of fact with respect to the claimed reasons for the original policy, and thus the reasons for finding it "obsolete."[17]

---

[17] The only meaningful objection defendant offered to this specific testimony was that it is "not relevant to the legal issues in this case." This objection is not well taken. Evidence that other insurers offered similar inducements to veteran sales representatives has the obvious tendency to rebut defendant's exceedingly vague claim (discussed below) that the MPR reductions put them at a competitive disadvantage. It also tends to support the inference that the central function of the policy, throughout the industry, was to secure the loyalty of seasoned agents by holding out the promise of a future reward.

Defendant also objected to the Westin declaration in its entirety on grounds that (1) "the entire declaration consists of naked argument"; (2) "it introduces no new evidence that could possibly create a triable issue of fact"; and (3) "Westin's opinions are based on financial data unrelated to CSAA and which was not used by nor even available to CSAA at the time it made its business decisions." Only the first of these suggests a recognized ground of objection—impermissible opinion—and it is so overbroad that it could quite properly have been overruled on that basis. The obligation of an objecting party is "to make clear the specific ground of the objection." (Evid. Code, § 353, subd. (a).) Depending on the nature of the evidence and the objection, the mere allusion to a rule of evidence may or may not satisfy this requirement. Here a blanket objection of "opinion" must necessarily have been overruled unless the court found the declarant unqualified to testify as an expert—a determination that CSAA did not invite the trial court to make. The second stated ground is utterly meaningless as an evidentiary objection. The third may be—and apparently was by the trial court—liberally construed as a claim that Westin's testimony was *irrelevant* because the *sources* from which he drew his figures did not exist when CSAA took the challenged actions. This argument could at most limit the purposes for which his opinions concerning CSAA's financial and competitive position might be admitted. To have that effect, it would have to appear that the underlying *facts*—as distinct from the sources cited for them—were of such a character that CSAA could not reasonably be supposed to have been aware of them. We find it unnecessary to decide whether this point appeared with sufficient clarity to sustain the trial court's ruling. Assuming

So far as this record shows, the most obvious business reason for promising reduced MPR's was not, as CSAA would have it, to shower benefits on older workers in a spirit of accommodation and generosity, but rather to give workers with large books of business an incentive not to stray. We do not say that this is the only explanation or even the correct one. But it is certainly a plausible one, directly inferable from the nature and circumstances of the policy, and that alone is enough to raise a triable issue of fact concerning the genuineness of CSAA's explanation for the 2001 *change* in policy.

### 3. *"Competitive Business Reasons"*

The two additional reasons Newcomer gave for the elimination of the policy were "internal fairness" and "competitive business reasons." No details were offered in support of the latter rationale, as for instance by summarizing the practices of CSAA's competitors. In contrast, as noted above, plaintiffs' insurance industry expert, Robert Westin, declared it "the common practice within the insurance industry" to "provide preferential treatment" to employees with seniority comparable to plaintiffs', "particularly those with exceptionally large and profitable books of business . . . ." This seems sufficient by itself to raise a triable issue of fact with respect to the claim of undefined "competitive business reasons."

Indeed we detect a certain tension between the claim of competitive advantage (or disadvantage) and Newcomer's averment that "[v]irtually none of the Sales Representatives used" the reduced MPR's. The only obvious mechanism by which the policy could inflict a competitive disadvantage was through the imposition of *costs* not borne by competitors. Yet if the policy was rarely invoked—"virtually" never, as Newcomer asserted—then any suggestion that it imposed burdensome costs on CSAA would seem doomed before a jury.[18]

### 4. *"Internal Fairness"*

This leaves Newcomer's assertion that the policy was adopted because it would serve the interests of "internal fairness." He declared that it would " 'level the playing field' for all Sales Representatives by applying MPR

---

the objection was well taken, considerable portions of the Westin declaration—including those we cite here—were entirely unaffected by it.

[18] Newcomer's averment to this effect was not inadvertent. In deposition he testified, "I don't believe we had terminated anybody for minimum production requirements in the last 18, 24 months. And to my recollection there was not a large population of sales representatives, not even a small population of sales representatives, that were using this provision." Asked whether "in fact nobody was using the provision," he replied, "I don't have an answer for you on that."

standards uniformly, regardless of age or years with the Company such that all Sales Representatives were held to the same standards." He testified in deposition to similar effect: "[E]very sales representative, had the same level playing field of which to go after new and referral business. So whether you were a brand new individual or one with tenure, the climate in which you worked was the same." He also characterized the objective as "to level the playing field among all of the sales representatives, improve the focus around productivity, and activities to drive productivity, and to put the company in a position to be more profitable with more focus around new sales." He further testified that "[t]here was no business reason to have a different productivity requirement for someone just because they had been tenured."[19]

A fact finder might find this account, as we do, nearly devoid of concrete substance. The repeated references to a "level playing field" convey little more than a vague sense that the reduced MPR's granted plaintiffs some undefined competitive advantage over their fellow sales representatives. The mechanism by which it did so, and the nature of the disadvantage thus inflicted, is nowhere explained. It is true, of course, that all agents were competing against each other, and against the agents of other companies, for the same theoretically limited resource, i.e., potential new customers. But from that perspective, imposing higher quotas on any one sales representative, or class of sales representatives, would appear *harmful* to the others because it would increase the competition for this limited resource.

The only sense in which Newcomer's testimony on this point suggests to us any concrete business concern is his reference in deposition to the *"climate in which [agents] worked."* (Italics added.) This suggests the possibility that having older workers working under relaxed production demands could damage the *morale* of younger workers and thus impair their productivity. But until CSAA announced its decision to eliminate the MPR reductions, every sales representative worked with the knowledge that veteran agents would earn a reduction in MPR's upon satisfying the age and years-in-service requirements. It is difficult to imagine why anyone would be offended by this policy or by its operation as to workers, like plaintiffs, who had satisfied its conditions and thus earned its benefits. On the contrary, it would naturally tend to operate as an incentive to remain productive and loyal. Nor are we directed to any evidence that during the 28 years of the policy's unquestioned existence anyone found it unfair. On the contrary, we would suppose that

[19] Newcomer apparently uses "tenure" only to mean some undefined but appreciable time in service. This usage is echoed by both sides throughout the record, including in the complaint and the expert declarations. But "tenure" is derived from *tenere*, to grip or hold, and properly refers to a *right* to *continued employment* as typified by faculty employment practices in higher education. (See 17 Oxford English Dict. (2d ed. 1989) p. 791; Black's Law Dict., *supra*, at p. 1607, col. 2.) By so noting we hope to help arrest the unfortunate devolution threatening to make the term a mere synonym for "seniority" or "time in service."

most representatives looked hopefully forward to the day when they themselves could invoke the MPR reductions, should they choose to do so.

In short, no unfairness would seem to appear in such a policy *until it was abolished.* The real thrust of CSAA's argument thus seems to be that the benefit promised to plaintiffs had to be sacrificed in order to *render invisible* the disparity between CSAA's past and present treatment of its workers. Assuming something like this is what Newcomer was attempting to describe with his references to a "level playing field," we question whether such a concern can be permitted to furnish a defense to a claim for age discrimination. We need not decide, however, for CSAA has not claimed that the purpose of eliminating the reduced MPR's was to protect the morale of younger workers. We have only derived that hypothesis by scrutinizing Newcomer's deposition testimony, which suggests it in passing. CSAA's actual explanation is one of "fairness," a claim to which it lends no substance whatever beyond frequent invocations of a hackneyed and inapposite metaphor.

### 5. *Plaintiffs' Evidence of Discriminatory Animus*

Even if CSAA's evidence of a legitimate nondiscriminatory purpose were not doubtworthy on its face, plaintiffs put it in issue by presenting evidence of a quite different motivation for CSAA's treatment of them, i.e., that CSAA wanted to get rid of older agents because it saw them as insufficiently vigorous, in contrast to younger workers, and it wished to appropriate to its own advantage the renewal premiums to which they would be entitled as long as they remained employees. This motive is most directly suggested by the declaration of Ona Brooks, who averred among other things that in March 2005, while she was employed as a sales agent at CSAA's Mountain View branch, her branch manager, Cheryl Turner, said in specific reference to "the 'Oakridge boys,' " that the company was " 'going in a direction where they are making it harder for the older reps to survive because the company doesn't want to pay them their renewals.' "[20] (Italics omitted.)

[20] Brooks declared that Turner made the statement in addressing Brooks's expressions of concern, having left the company and returned, about CSAA's direction: "I had doubted my decision to come back to CSAA, and these concerns prompted a conversation with Ms. Turner during which she advised me that CSAA did not want the older Sales Representatives around anymore, that they did not want Sales Representatives who were *'living off their renewals,'* and she then referenced *'their huge book of business.'* As best I can further quote: *'CSAA is going in a direction where they are making it harder for the older reps to survive because the company doesn't want to pay them their renewals.'* She also mentioned that CSAA does not want Sales Representatives *'sitting on their numbers,'* that the company is looking for *'new blood'* to go forward. [¶] 4. The above comments were specifically referring to the 'Oakridge boys,' our Sales Representatives in the San Jose-Oakridge office, as well as to seven (7) other Sales Representatives that were part of the lawsuit situated in Alameda County."

CSAA's objections to this evidence are discussed in footnote 4, *ante.*

Whether a desire to stop paying plaintiffs' renewal commissions could be held to constitute a legitimate business reason as against a claim for disparate treatment is a question neither party has briefed, for the simple reason that CSAA has not cited such a reason for its conduct.[21] That it conflicts sharply with the rationale actually put forward tends to put that rationale further in issue.

In any event, the Brooks declaration pointed directly toward an anti-senior animus by attributing statements to a CSAA manager that the company was "looking for *new blood* to go forward" and "did not want the older Sales Representative around anymore." Plaintiffs adduced other evidence to similar effect. Plaintiff Mellen declared, "In late 2004 or early 2005, the Manager of the San Jose-Stevens Creek office said that if it were up to him, he would get rid of the '*old slugs*,' referring to several other Sales Representatives and me that had been with CSAA in excess of 25 years at the time. He was in my cubicle when he said it." Mellen complained to his manager, who "did nothing about it."[22]

---

[21] We note that to lay off older workers because of the increased compensation to which they have become entitled would seem to violate, at least in spirit, the age discrimination statute as pointedly amended in 2002 to repudiate the holding in *Marks v. Loral Corp.* (1997) 57 Cal.App.4th 30 [68 Cal.Rptr.2d 1]. That decision held that cost cutting was an adequate justification for laying off higher paid workers, notwithstanding the disparate impact such a strategy would have on older workers. The statute was amended to explicitly declare that "the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group . . . ." (Gov. Code, § 12941, originally adopted as Gov. Code, § 12941.1, in Stats. 1999, ch. 222, § 2, p. 2190.) The Legislature went on to declare "that the courts [are to] interpret the state's statutes prohibiting age discrimination in employment broadly and vigorously, in a manner comparable to prohibitions against sex and race discrimination, and with the goal of not only protecting older workers as individuals, but also of protecting older workers as a group, since they face unique obstacles in the later phases of their careers." (Gov. Code, § 12941.) This language echoed a proposed view of the statute that had been explicitly considered and *rejected* in *Marks v. Loral Corp., supra,* 57 Cal.App.4th at page 44.

[22] CSAA objected to these averments on hearsay grounds. The stated circumstances may not have been sufficient to raise an inference that the original speaker, who did not supervise Mellen, was authorized to express the company's view on such matters. But the response of Mellen's own supervisor—or lack of same—may constitute a ratification or adoption by one who *was* authorized to communicate such matters to Mellen. (See Evid. Code, § 1221.) Moreover that silence could be understood to extend the original remarks from a mere expression of *personal* animus (see Evid. Code, § 1250) to evidence of a general management attitude of hostility to "old slugs."

CSAA also asserted that Mellen's averments on this point conflicted with his deposition testimony on two points, i.e., whether he understood "old slugs" to include himself, and whether his own branch manager did anything in response to his complaints. The first point depends on Mellen's testimony that he did "not know who specifically" the manager "was referring to." This testimony is not logically incompatible with a belief that Mellen was among the "old slugs" in question. Moreover, the evidence would be probative of discriminatory animus whether or not Mellen so understood. The second point depends on his testimony that

Darlene Bogle declared that she worked for CSAA from 1996 until April 2003 and that for the last four of these years she "had direct communications with senior Sales Management, including district Sales Managers."[23] She averred that she "was told directly and indirectly (being part of the conversation) on numerous occasions that CSAA wants to rid itself of senior Sales Representatives, that they were '*living on their renewals*' and '*that's coming to an end.*' They referred to the process as '*cleaning house.*' "[24]

In sum, there was more than sufficient evidence before the trial court—much of it inherent in the moving papers themselves—to raise a triable issue of fact concerning CSAA's real motivation for terminating plaintiffs' employment.

## III. *Retaliation*

FEHA makes it unlawful for an employer or other person to "discharge . . . or otherwise discriminate against any person because the person has opposed any practices forbidden under this part." (Gov. Code, § 12940, subd. (h).) A violation of this prohibition occurs when the employer takes harmful action against an employee in retaliation for the latter's engaging in a protected activity. As we have previously observed, the elements of such a claim are substantially the same as those for disparate treatment except that instead of having to show that the action was motivated

---

after complaining to his own manager, he did not follow up because he believed his manager's statement that he would do something. Again, the cited testimony is not logically incompatible with Mellen's averment that the manager in fact did nothing. While this testimony will undoubtedly provide fodder for cross-examination at trial, it cannot have the effect contended for on summary judgment.

[23] Although we find no concise description of CSAA's management hierarchy in this record, we surmise that district managers were the next level above branch managers.

[24] CSAA objected to these averments on six grounds, of which the most colorable again appears to be hearsay. They refer to the speakers as "unnamed supervisors," but they cite us to no authority requiring that a corporate agent be named before his statement may be found to satisfy the conditions for a vicarious admission. The description of the speakers as "senior Sales Management, including district Sales Managers," appears sufficient to support an inference that they had authority to speak for the company concerning the retention *vel non* of sales personnel. It is true that the declaration might have been more credible if speakers had been named, but testing credibility is the function of cross-examination or deposition—not summary judgment.

Bogle also declared that one of her jobs was training new sales representatives and discharging new hires who proved unsuitable, and that "[t]he direction I was given was that CSAA wanted young, aggressive Sales Representatives who would last three to five years." CSAA's hearsay objection is in this case well taken. With no identification of the speaker or indication of his or her capacity, it is impossible to say whether the conditions of a vicarious admission were present. (See Evid. Code, § 1222.) CSAA's other grounds of objection—lack of foundation and relevance—are meritless.

by animus toward the plaintiff as a member of a protected class, the plaintiff must show that the motive was retaliatory animus. (*Mamou, supra,* 165 Cal.App.4th 686, 713; see *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

The gist of plaintiffs' retaliation claims here was that CSAA discharged them because of their opposition to the elimination of the MPR reductions as reflected in the 2001 and 2005 modifications to the compensation plan. Plaintiffs contend that the modifications themselves violated FEHA, or that they reasonably believed them to do so, and that their discharges were therefore accomplished in retaliation for opposing discrimination.

We do not doubt that plaintiffs engaged in a protected activity when they objected to the discontinuation of the MPR reductions as a violation of FEHA. CSAA's argument to the contrary presupposes that its conduct did not in fact violate FEHA, a premise it has failed to establish for purposes of summary judgment. Nor would it be dispositive if it were established. As CSAA acknowledges, a worker's opposition to an employment practice may be protected against retaliation even if the practice did not in fact violate FEHA, provided the plaintiff "reasonably believed" the practice was unlawful. (*Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1168 [104 Cal.Rptr.2d 95].) We reject CSAA's suggestion that plaintiffs could not have reasonably believed that the elimination of the MPR reductions violated FEHA. As we have held, it may well violate FEHA. The only basis for doubting it is that defendant might have acted, as it now insists, for a legitimate nondiscriminatory reason. Plaintiffs could hardly be expected to suppose that to be true, particularly since the conduct was exclusively aimed at older workers toward whom at least some CSAA managers had expressed hostility. Contrary to the point suggested by CSAA's citation of *Querry v. Messar* (S.D.N.Y. 1998) 14 F.Supp.2d 437, 451, the fact that plaintiffs consulted counsel would not weaken their case unless counsel could be supposed to have told them their complaints were meritless. Here, counsel could quite reasonably believe that CSAA's actions would be found to violate FEHA.

Plaintiffs' retaliation claim appears insupportable, however, when it comes to the element of causation. As we understand plaintiffs' theory, the event triggering their objections was CSAA's announcement that it was eliminating the MPR reductions plaintiffs had earned. As discussed in connection with the statute of limitations, this announcement by itself inflicted no injury on plaintiffs. The injury occurred only when CSAA discharged plaintiffs. In McCaskey's case, that action was predicated, at least ostensibly, on his failure

to satisfy the unadjusted MPR's. The threat of such action was implicit, if not explicit, in the elimination of the former policy. In essence, as we have said, the elimination of the policy was a renunciation of CSAA's former undertaking *not to discharge plaintiffs* for producing less than the full MPR's required. It was, therefore, a threat to discharge them for that conduct. CSAA had already committed itself to that action should plaintiffs fail to satisfy the full MPR's. When McCaskey did so, CSAA merely carried through on its commitment. There is no reason to believe that McCaskey's "opposing" such action, however far in advance of its occurring, had any effect at all on CSAA's conduct. Indeed, so far as this record suggests, McCaskey could have remained entirely silent about his opposition to the elimination of the reduced MPR's and he would still have been fired when he failed to satisfy the full quotas. His opposition appears entirely irrelevant to the chain of events leading to his discharge.

Similarly, when Mellen and Luke were presented with the 2005 plan they were told that they must sign it or be deemed to have resigned. They refused to sign it, and CSAA discharged them. This may have constituted a breach of contract; it may have constituted age discrimination; but we fail to see how it could constitute retaliation for their "opposing" CSAA's conduct. They were discharged not for objecting, but for *refusing to sign*. There is no suggestion that had they signed, they would still have been discharged merely for objecting to, or otherwise opposing, CSAA's conduct.

In short, by asserting that CSAA's announced discontinuation of the MPR reductions would violate FEHA, plaintiffs certainly engaged in a protected activity. But whether it makes any factual or legal sense to characterize their subsequent discharges as *retaliation* for this activity is another question. Reduced to its essentials, this case presents the situation of an employer who announces that he is going to discharge workers who fail to meet certain conditions; the workers object that the conditions violate, and the threatened discharge would violate, FEHA; the conditions come into being; and the employer goes ahead with the threatened discharge. In the absence of some reason to suppose that the original threat was not genuine, or that the employer would not have carried it out but for the workers' opposition to it, there is simply no basis to conclude that the discharge was caused by, or was in retaliation for, their invocation of FEHA.

We therefore conclude that while CSAA is mistaken in challenging the status of plaintiffs' objections as protected conduct, it has succeeded in demonstrating the absence of any triable issue of fact on the question of causation.

## DISPOSITION

The judgment is reversed with directions to set aside the order granting summary judgment and to enter a new order granting defendant's motion for summary adjudication as to plaintiffs' disparate impact and retaliation claims only, and otherwise denying defendant's motion for summary judgment or summary adjudication. Costs to appellants.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied November 23, 2010, and respondents' petition for review by the Supreme Court was denied February 16, 2011, S188788. Baxter, J., and Corrigan, J., were of the opinion that the petition should be granted.