Filed 1/14/26  P. v. Osuna CA4/2
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

　　　Plaintiff and Respondent,

v.

ROBERTO TIRADO OSUNA,

　　　Defendant and Appellant.

E081292

(Super. Ct. No. FVA901805)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Katrina West, Judge.  Modified in part, affirmed in part.

Bruce L. Kotler, and Howard Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher Beelsey, and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

# INTRODUCTION

Defendant and appellant Roberto Tirado Osuna was charged with five felonies for his involvement with a double-homicide robbery that he committed along with his codefendants, Lee Johnson and Luis Ordonez Zepeda. In 2011, defendant entered into a plea agreement, which required him to testify, as needed, in the prosecution of his codefendants. In exchange for his guilty plea, defendant would receive a significantly lighter sentence than the one he faced if convicted as charged (25 years instead of 74 years to life). His codefendants' cases, however, did not resolve until Zepeda pled guilty in 2020 and Johnson pled guilty in 2021. During that time, defendant initially cooperated, but he eventually refused to testify in either codefendants' trial.

In 2022, defendant moved to withdraw his plea agreement on the ground that the prosecution had breached it. The court denied the motion, found that defendant had breached his plea agreement, and sentenced him to an indeterminate term of 73 years, 4 months to life.

Defendant appeals, arguing that the prosecution violated the terms of the plea agreement by taking 10 years to prosecute his codefendants and, in turn, the trial court erroneously denied his motion to withdraw his plea agreement. Defendant also appeals the trial court's denial of his petition for resentencing under Penal Code section 1172.6.[1]

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

We affirmed in all respects in a prior opinion.  (*People v. Tirado Osuna*, 2025 WL 1671627 [nonpub. opn.].)  Our Supreme Court granted review and returned the case back to us with directions to vacate our opinion and reconsider the case in light of *People v. Antonelli* (2025) 17 Cal.5th 719 (*Antonelli*).

In doing so, we permitted the parties to file supplemental briefs, but only defendant elected to do so.  We also granted defendant's request to permit briefing on a sentencing issue he did not previously raise.  For the reasons that follow, we reduce defendant's sentence by 28 months but otherwise affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Motion to Withdraw Plea*[2]

In 2010, defendant was charged with two counts of murder (§ 187, subd. (a); counts 1-2), one count of assault by means likely to produce great bodily injury (§ 245, subd. (a)(1); count 3), one count of first-degree burglary (§ 459; count 4), and one count of attempted home invasion robbery (§§ 664/211; count 5).  The information alleged defendant personally used a firearm in the commission of three of the offenses (§ 12022.53, subd. (b); counts 1-2, 5).  If convicted, the maximum term defendant faced was 74 years to life.

---

[2]  In his brief following remand from the Supreme Court, defendant does not address this issue.  We therefore re-adopt our prior opinion's discussion of the issue.

In November 2011, however, defendant entered into a plea agreement. Defendant agreed to the following terms (among others): (1) he will plead guilty as charged, (2) he will be sentenced after his codefendants' cases have resolved, whether by plea, trial, or dismissal, (3) he will cooperate with law enforcement and testify truthfully, which may require him to testify at his codefendants' trials, (4) if he testifies truthfully, the prosecution would allow him to withdraw his guilty plea and enter a new plea that would reduce his maximum potential sentence from 74 years to life to a determinate 25-year term, (5) if a judge finds that defendant breached the agreement, including by not testifying truthfully "at all hearings," then defendant will not be allowed to withdraw his plea and he could be sentenced to a term of 74 years to life.

At a change-of-plea hearing, the trial court thoroughly discussed the plea agreement to make sure defendant understood what he was agreeing to. The court explained that defendant was "agreeing that you're going to cooperate with law enforcement and testify truthfully if you're called upon to testify." In particular, defendant might have to testify at the preliminary hearings and trials of his codefendants, and "[i]f someone calls you to testify, you have to testify."

After discussing the agreement's terms further, defendant asked when he would have to come back to court. The trial court noted the preliminary hearing for one of his codefendants was tomorrow and that the prosecutor planned to call defendant as a witness. The court thus explained: "So when is this all going to start? Tomorrow. When is it going to end? Don't know. I don't know how long it's going to take for us to

4

start the trial or trials, and how long it's going to take to finish. Don't know how long it's going to take. It's going to start tomorrow."

Defendant then asked, "In order for me to be sentenced, then all this has to go through first?" The trial court replied, "Yes. [¶] So probably you won't be sentenced for quite some time. I don't know how long. I'm sure at least a couple months, perhaps longer; but the agreement is you testify first before you get sentenced. [¶] So the trials have to happen before you can be sentenced. How long will that be? I don't know." The court asked if defendant had any more questions, and he said he did not.

After discussing the agreement some more, the trial court accepted defendant's plea without objection. The court set sentencing for two months out and proposed that, "[i]f everything is all taken care, we can do sentencing then," but "if it hasn't been taken care of, it probably won't be, we'll end up postponing it again if [defendant] agree[s] to postpone it." Defendant agreed.

About a week later, defendant testified at Zepeda's preliminary hearing, where Zepeda was held to answer for the same five charges defendant faced. However, the prosecution dismissed and refiled the charges against Zepeda and Johnson in April 2013, and defendant testified again at another preliminary hearing for Zepeda. In March 2014, defendant testified at yet another preliminary hearing for Zepeda, as well as Johnson's preliminary hearing.

In October 2020, Zepeda pled guilty to two lesser charges carrying a determinate sentence of 25 years. According to the prosecution, the plea came about in part because

5

defense counsel suggested that defendant would not testify against Zepeda due to fear of retaliation against him and his family.

In August 2021, defendant appeared at a pre-trial hearing for Johnson's trial, but he refused to be sworn in and said he would not testify. The trial court ordered him to return the next day and to think about the consequences of not testifying. Defendant returned the following day and, again, he refused to be sworn in and to testify. When the prosecution stated that defendant would violate his plea agreement if he did not testify and would therefore face 74 years to life in prison, defendant said that he understood. In November 2021, Johnson pled guilty to lesser charges with a determinate sentence of 21 years.

In May 2022, defendant moved to withdraw his guilty plea. He argued the plea was invalid for several reasons, including that he did not expect the prosecutions of Zepeda or Johnson to take over 10 years. Defendant thus argued that, because he did not anticipate such a lengthy contract, he did not validly enter into the plea agreement. Defendant further argued that the prosecution breached the plea agreement by taking over 10 years to prosecute his codefendants. Defendant therefore asked that the trial court allow him to withdraw his guilty plea and "fight the case" or, alternatively, to enforce the plea bargain and sentence him to 25 years.

The trial court denied the motion, refused to allow defendant to withdraw his guilty plea, and refused to sentence defendant to 25 years. In doing so, the court found that defendant breached the plea agreement by refusing to testify at Johnson's trial, which

6

disentitled him from the benefit of the agreement (a 25-year sentence).[3] The court noted that defendant never complained about the amount of time he waited for Zepeda and Johnson to be prosecuted before moving to withdraw his plea and instead repeatedly waived time for sentencing. In the court's view, this "strongly suggest[ed]" that defendant's "desire to avoid the consequences for breaching the agreement was the impetus" for his motion to withdraw.

The court later sentenced defendant, pursuant to the plea agreement, to a term of 50 years to life, plus 23 years 4 months. Defendant timely appealed.

B. *Petition for Resentencing*

While defendant's motion to withdraw his plea was pending, defendant filed a petition for resentencing under then-section 1170.95 (now § 1172.6). The parties stipulated that the petition stated a prima facie case, so the court held an evidentiary hearing.

At that hearing in April 2023, the parties stipulated that defendant was not entitled to resentencing relief as to the murder of Lucio Jimenez (count 2) because it was a provocative act murder. The parties also stipulated to the preliminary hearing, police reports, and rap sheets as the factual basis for defendant's plea.

F.P., the victim in count 3, testified at the preliminary hearing. F.P. was friends with the murder victim in count 1, Robert Ramirez. While at Ramirez's house, F.P. went

---

[3] The trial court found that defendant breached his plea agreement by refusing to testify at Johnson's trial, but made no finding as to whether he refused to testify in Zepeda's case or whether his failure to do so breached the agreement.

7

outside to go to his car and encountered two men, Jimenez and defendant. Jimenez asked for someone by a name that F.P. did not recognize, so F.P. said nobody by that name lived there and tried to close the door. F.P. was then sprayed in the face and hit in the head with a hard object, and fell down. The men kicked and punched F.P. and one of them said, "shut up and stay down."[4] A few minutes later, F.P. heard about 10 gunshots come from Ramirez's master bedroom. F.P. fled and, when outside, saw defendant exit the house holding his stomach.

Ramirez's wife, G.R., also testified at the preliminary hearing. She testified that on the morning of the shooting, F.P. came over to help with a project at her house. While lying in bed in the master bedroom, she heard "screaming near the entry way of the house," a "commotion," and "movement." Ramirez told her to go to the bathroom and lock the door, which she did.

As G.R. was closing the bathroom door, she saw Ramirez "bending down towards the foot of the bed," seemingly to grab a gun, as someone ran down the hallway toward the room. G.R. then heard six to 10 gunshots, silence, then a second series of multiple gunshots. When she opened the bathroom door, she saw Jimenez lying motionless, face down on the floor and defendant moaning while crawling toward a sliding glass door leading to the backyard. G.R. went back into the bathroom and closed the door, then

---

[4] F.P. testified that the assailant who said "Shut up and stay down" did so in clear English without an accent, which suggests it was Johnson, who was the only native English speaker. The record is thus unclear as to whether defendant physically assaulted F.P.

heard someone repeatedly say in English without an accent, "'Dude, get up. We got to get out of here.'"

According to defendant, however, he "passed out" after he got shot. When he came to, he was on the floor in a bedroom. He crawled out of the house through sliding glass doors into the backyard, reentered the house, left through the front door and sought aid from gardeners.

Responding Fontana Police Officer Christian Mercado also testified at the preliminary hearing. He stated that he arrived on the scene and encountered defendant bleeding on the sidewalk just south of Ramirez's house.

The lead detective, Cliff Ohler, also testified at the preliminary hearing. Ohler recounted what he observed at the scene. He found Ramirez in the hallway outside of the master bedroom holding a 9mm Glock. Ramirez was dead with severe trauma to his head from a gunshot wound. Ohler found Jimenez dead in the master bedroom just outside of the bathroom door, with two handguns and duct tape next to him.

Finally, Detective Daniel Delgado testified about his interview with defendant right after the incident. According to Delgado, defendant admitted to going to Ramirez's house with his cohorts to steal $100,000 in cash and 60 kilograms of cocaine. Defendant said that he and his accomplice, Luis Zepeda, met twice beforehand and had several phone calls to plan the robbery. Their plan was to tie up the occupants while stealing the cash and drugs.

9

Defendant told Delgado that he, Zepeda, Johnson, and Jimenez met at a gas station shortly before the incident, then they drove to Ramirez's house. According to defendant, Johnson told him and Jimenez to remove all their personal belongings, then he handed them bulletproof vests. Defendant put on the vest and then saw Johnson grab a shotgun from the backseat.

While holding guns and with defendant wearing a bulletproof vest,[5] defendant and Jimenez then approached Ramirez's door and knocked. At that time, defendant could see Johnson holding the shotgun while standing near the garage about 11 feet away. Jimenez sprayed the person who opened the door (F.P.) with Mace, knocked him down, and the two then walked down the hall toward the master bedroom with their guns drawn. As they entered the bedroom, Jimenez was shot multiple times and fell to the ground. Defendant was also shot multiple times.

Based on the evidence presented, the court found that Jimenez and defendant engaged in a gunfight with Ramirez, which ended with Jimenez dead, defendant shot, and Ramirez unwounded. When Ramirez left the bedroom, however, Johnson shot and killed him. The trial court found that defendant was ineligible for resentencing for Ramirez's death because he was a major participant who acted with reckless indifference to human

---

[5] The evidence about whether Jimenez was wearing a bulletproof vest was conflicting. Defendant stated in an interview with police that both he and Jimenez wore bulletproof vests, but a detective investigating the scene claimed Jimenez was not wearing one, G.R. described him as wearing a "blue or black sweater" but no vest, and the autopsy report did not identify a vest in Jimenez's personal belongings. In any event, the trial court seemingly found that only defendant wore a bulletproof vest.

life when committing the underlying robbery that left Ramirez dead.  And because defendant stipulated he was ineligible for resentencing for Jimenez's murder, the trial court denied defendant's resentencing petition.

III.

DISCUSSION

A.  *Motion to Withdraw Plea*

Defendant contends that he is entitled to the benefit of his plea agreement—a sentence of 25 years—because the prosecution breached the agreement by taking an unreasonably long time (10 years) to prosecute Zepeda and Johnson.  Defendant thus argues that the trial court erroneously denied his motion to withdraw his guilty plea and to enter a plea to the lesser charges and receive a 25-year sentence.  We disagree.[6]

This case turns on what the parties intended when they entered into the plea agreement with regard to defendant's agreement to testify in the proceedings against his codefendants.  The People argue that the parties understood and agreed that defendant would testify truthfully, as requested, in all proceedings until his codefendants' cases were completed, however long that took.  Defendant, on the other hand, argues he agreed only to a "reasonable time" to perform his end of the bargain, and 10 years is not reasonable.

_____

[6] We deny defendant's request for judicial notice because we need not consider the documents he asks us to consider in order to resolve his appeal.

11

We interpret plea agreements like any other kind of contract. (*People v. Segura* (2008) 44 Cal.4th 921, 930; *People v. Shelton* (2006) 37 Cal.4th 759, 767.) To determine how long a contract is in effect, and thus how long parties to it must perform their contractual obligations, we use a three-step process. (See *Consolidated Theatres, Inc. v. Theatrical Stage Employee Union* (1968) 69 Cal.2d 713, 731.) We first look to the contract itself. (*Ibid.*) "If it specifies the duration of the duty at issue, that will ordinarily end the matter." (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 966.) But "[i]f the agreement does not plainly state when the duty will end," we proceed to the second step, where the contract's "duration must be 'judicially determined in accordance with established rules of construction.'" (*Ibid.*) This is an objective inquiry which asks how a reasonably intelligent person aware of the circumstances surrounding the contract would interpret its terms. (*Vulcan Lands, Inc. v. Currie* (2023) 98 Cal.App.5th 113, 123; Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."].) If—and only if—the first two steps do not reveal the parties' intent, then "the law implies that the term of duration shall be at least a reasonable time." (*McCaskey v. California State Automobile Assn.*, *supra*, at p. 966, italics omitted; see also Civ. Code § 1657 ["If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."].)

Applying these principles, we agree with the People that defendant's plea agreement provided that he would testify, as needed, until his codefendants' cases resolved, no matter how long that took. The plain language of the plea agreement makes this clear. The agreement stated that (1) defendant's sentencing would not take place until his codefendants' cases were resolved, (2) he agreed to "[a]ppear at any and all hearings" in his codefendants' cases, as ordered, and (3) he would "testify truthfully at all [those] hearings." Taken together, these provisions confirm that defendant agreed to testify truthfully, as ordered, at all of the proceedings in his codefendants' cases until they were completed.

Any ambiguity in the plea agreement as to its duration is dispelled by defendant's colloquy with the trial court during the change-of-plea hearing. (See *Welch v. Welch* (2022) 79 Cal.App.5th 283, 298 [court may refer to extrinsic evidence to ascertain contracting parties' intent if contract is ambiguous].) When defendant asked when he had to come back to court, the trial court told him "[t]omorrow," then noted that it was unknown how long defendants' codefendants' trials would take. The court explained, "When is it going to end? Don't know. I don't know how long it's going to take for us to start the trial or trials, and how long it's going to take to finish. Don't know how long it's going to take." Defendant then asked, "for me to be sentenced, then all this has to go through first?" The court replied, "So probably you won't be sentenced for quite some time. I don't know how long. I'm sure at least a couple months, perhaps longer; but the

agreement is you testify first before you get sentenced. [¶] So the trials have to happen before you can be sentenced. How long will that be? I don't know."

The trial court's statements made clear that defendant had to abide by the plea agreement's terms—including by testifying in his codefendants' cases whenever asked—until those cases resolved. Importantly, the court also made clear that it was unknown how long that would take. After the trial court thoroughly explained the agreement to defendant and answered every question he had about it, defendant said he understood everything and had no more questions.

Nothing at the change-of-plea hearing or elsewhere in the record suggests that, when entering into the plea agreement, defendant did not understand that he would have to testify whenever required until his codefendants' cases resolved, however long that might take. The agreement's terms, coupled with defendant's colloquy with the trial court, show that he agreed, without limitation, to testify at all proceedings in his codefendants' cases until they resolved, and he knew that it was unknown how long that obligation would last. We therefore need not consider what a "reasonable time" for performing the contract would be.

In short, the trial court correctly found that defendant breached the plea agreement by refusing to testify at Johnson's trial, which allowed the trial court to accept defendant's guilty plea and sentence him to 74 years to life. The trial court thus properly refused to allow defendant to withdraw his plea and, in turn, properly sentenced him pursuant to the agreement, to 73 years, four months instead of 25 years. (See *People v.*

14

*Alexander* (2015) 233 Cal.App.4th 313, 317-318.)

B.  *Petition for Resentencing*

As to Jimenez, defendant argues the trial court erroneously found that he was liable for the provocative act murder of Jimenez and that his attorney was ineffective for stipulating that section 1172.6 does not apply to such a murder.  As to Ramirez, defendant argues there was insufficient evidence that he acted with reckless disregard for human life.  We reject defendant's contentions.

1.  *Applicable Law*

"Senate Bill [No.] 1437 [(2017-2018 Reg. Sess.)] significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'"  (*People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).)

Pursuant to section 1172.6, as amended by Senate Bill No. 775 in 2021, in the context of a guilty plea, "a petitioner convicted of murder is ineligible for resentencing if the record establishes, as a matter of law, that (1) the complaint, information, or indictment did not allow the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine, or another theory of imputed malice; (2) the petitioner was not convicted under such theory; or (3) the petitioner could presently be convicted of murder or attempted murder under the law as

15

amended by Senate Bill No. 1437 . . . ."  (*People v. Flores* (2022) 76 Cal.App.5th 974, 987.)

"Senate Bill [No.] 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended. [Citations.]  Under newly enacted section 1172.6, the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill [No.] 1437 [citation]."  (*Strong*, *supra*, 13 Cal.5th at p. 708, fn. omitted.)

If the section 1172.6 petition for resentencing contains all the required information, including a declaration by the petitioner that he or she is eligible for relief based on the requirements of subdivision (a), the court must appoint counsel to represent the petitioner upon his or her request (§ 1172.6, subd. (b)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 970.)  The court also must direct the prosecutor to file a response to the petition and permit the petitioner to file a reply within 30 days after the prosecutor's response is filed, and then the court must "hold a hearing to determine whether the petitioner has made a prima facie case for relief."  (§ 1172.6, subd. (c).)

Once the court determines that a defendant has made a prima facie showing, it "must [then] hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted

16

murder' under state law as amended by Senate Bill [No.] 1437. [Citation.] 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'" (*Strong*, *supra*, 13 Cal.5th at p. 709; accord, *People v. Lewis*, *supra*, 11 Cal.5th at p. 960.)

Effective January 1, 2022, Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill No. 775) "'[c]larifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories.'" (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.)

On appeal from an order denying a petition under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090.) We "'"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."'" [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial

17

judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; see *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 124-125.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

### 2. *Jimenez's Murder*

Defendant contends his trial counsel was ineffective for stipulating that he was not entitled to resentencing relief for Jimenez's murder. We disagree.

To prevail on an ineffective assistance of counsel (IAC) claim, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; accord, *People v. Johnson* (2015) 60 Cal.4th 966, 979-980; see *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1148.) A ""reasonable probability"" is a probability sufficient to undermine confidence in the outcome of the proceeding. (*People v. Mbaabu*, *supra*, at p. 1149; *Strickland v. Washington*, *supra*, at p. 697.) The defendant bears the burden of demonstrating by a preponderance of the evidence that

defense counsel's performance was deficient and it resulted in prejudice. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) If the record sheds no light on counsel's actions, the claim must be rejected unless no satisfactory explanation exists or counsel was asked for an explanation and failed to provide one. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) We will not find IAC "unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Defendant's counsel had good reason to stipulate that defendant was not entitled to resentencing relief for Jimenez's murder because there was ample evidence that defendant was guilty of provocative act murder, which remains a valid theory of murder liability after Senate Bill Nos. 1437 and 775 under the circumstances here.

Our Supreme Court recently explained in *Antonelli* that, before its 2009 decision in *People v. Concha* (2009) 47 Cal.4th 653 (*Concha*), its precedents allowed for conviction for provocative act murder whereby malice could be imputed to a nonprovocateur accomplice solely based on his or her participation in a crime. (*Antonelli*, *supra*, 17 Cal.5th at p. 696.) *Concha* changed the law and made clear that a defendant must personally harbor malice to be convicted of provocative act murder. (*Id.* at p. 697.) More specifically, *Concha* established that a nonprovocateur accomplice must

19

personally harbor malice to be liable for murder under a provocative act murder theory. (*Ibid.*)

Because defendant pled guilty in 2011, post-*Concha*, he is ineligible for resentencing if he was liable for provocative act murder, irrespective of Senate Bill No. 775. (See *People v. Lee*, *supra*, 95 Cal.App.5th at p. 1184; *People v. Venancio* (2025) 114 Cal.App.5th 593, 598 (*Venancio*); *People v. Taylor* (2025) 108 Cal.App.5th 849, 867 (*Taylor*).) Defense counsel thus had reasonable grounds to stipulate that defendant was ineligible for resentencing so long as counsel had reasonable grounds to believe defendant was guilty of provocative act murder.

There was ample evidence that he was. A provocative act murder is one in which the perpetrator of an underlying crime is held liable for the killing of an accomplice by a third party. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 602.) "A murder conviction under the provocative act doctrine . . . requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 655.) So if the perpetrator of a crime maliciously commits an act that is likely to result in the victim's death, and the victim kills the perpetrator's accomplice in response to that act, the perpetrator is guilty of provocative act murder. (*People v. Johnson*, *supra*, 57 Cal.App.5th at p. 265.) Thus, to find defendant guilty of the provocative act murder of Jimenez, the court had to find that defendant "knew [Jimenez] intended to shoot at [Ramirez] and/or his associates, intended

20

to aid [Jimenez] in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Taylor*, *supra*, 108 Cal.App.5th at p. 868.)

Defendant and his codefendants went to Ramirez's house to steal 60 kilograms of cocaine and about $100,000 in cash. Defendant, Jimenez, and Johnson went to the front door armed with handguns and defendant was wearing a bullet proof vest. When F.P. opened the door, Jimenez sprayed F.P. in the face with Mace and then knocked him on the ground. Jimenez and defendant then entered the house and proceeded to the master bedroom, when Ramirez, a known drug dealer, began shooting at them.

This was compelling evidence of a provocative act, regardless of who shot first and whether defendant shot at all.[7] (See *Garcia*, *supra*, 69 Cal.App.4th at pp. 1329-1330 ["[A] gun battle can be initiated by acts of provocation falling short of firing the first shot"]; *People v. Flores* (2023) 96 Cal.App.5th 1164, 1172 [defendant liable for

---

[7] Defendant argues the trial court erroneously found that defendant or Jimenez shot at Ramirez first, then Ramirez shot back. It is unclear whether the trial court so found. The trial court stated that it found that "Jimenez and/or [defendant] fired his or their weapons presumably towards Ramirez without hitting him. And Ramirez fired his weapon and killed Jimenez and shot and injured [defendant]." This could be construed as the court finding that Jimenez and/or defendant shot at Ramirez, and *then* "Ramirez fired his weapon." Ultimately, however, the distinction does not matter here, because defense counsel could have reasonably believed that defendant's behavior before any shots were fired was more than enough to find him guilty of provocative act murder. (See *Taylor*, *supra*, 108 Cal.App.5th at p. 868 [explaining that nonprovocateur accomplice could be liable of provocative act murder if he knew provocateur accomplice intended to shoot at the victim, intended to aid in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard to life]; *People v. Cervantes* (2001) 26 Cal.4th 860, 867 [in typical provocative act murder case, "the perpetrator of the underlying crime instigates a gun battle, either by firing first *or* by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct," italics added].)

21

provocative act murder of accomplice when pursuing officers shot accomplice while defendant was driving getaway car]; *People v. Mejia* (2012) 211 Cal.App.5th 586, 603 [defendant may be liable for provocative act murder based on aiding and abetting provocateur to commit the underlying crime].) There was also strong evidence that defendant harbored malice or an intent to kill, which was "implied from the nature of the provocative act." (*Venancio*, *supra*, 114 Cal.App.5th at p. 607; see also *People v. Gonzalez*, *supra*, 54 Cal.4th at p. 655 ["Malice will be implied if the defendant commits a provocative act knowing that this conduct endangers human life and acts with conscious disregard of the danger."].)

Defendant, Jimenez, and Johnson forcibly entered a known drug dealer's home with the intent to steal a large amount of cocaine and money. They did so while carrying handguns[8] and defendant was wearing a bulletproof vest. The only reasonable inference from this evidence is that they were prepared for a gunfight, meaning that they were prepared to shoot and kill someone to execute their plan.

It is thus immaterial that, according to defendant, he and Jimenez planned only to tie up whoever was in the house while they stole the drugs and cash. It is also immaterial who shot first. (See *Venancio*, *supra*, 114 Cal.App.4th at p. 608.) What matters is that

---

[8] On remand, defendant challenges our prior opinion's statement that Jimenez and defendant were "brandishing" their guns. The manner they presented their guns in the brief period between entering Ramirez's home and the ensuing gun battle between them is immaterial. Whether they were brandishing the guns or simply carrying them does not change the fact that they forcibly entered Ramirez's house apparently ready for a gun battle.

22

defendant, Jimenez, and Johnson prepared for a gunfight while committing a violent, forcible home invasion of a known drug dealer.  It was thus highly probable that defendant's provocative act—forcibly entering Ramirez's house with Jimenez while both were armed and defendant wore a bulletproof vest—would lead to a gun battle that would leave someone dead.  (*Taylor*, *supra*, 108 Cal.App.5th at p. 864; *Venancio*, *supra*, at p. 608.)  This was a "typical case" of provocative act murder where Jimenez and defendant "'instigate[d] a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and . . . gun-wielding conduct.'"  (*Venancio*, *supra*, at p. 607.)  The act of forcing entry into the home of a known drug dealer and initiating a confrontation by entering his bedroom while armed and wearing body armor was itself a sufficiently provocative act.

In short, there was strong evidence that defendant was guilty of provocative act murder for Jimenez's death.  And because defendants properly convicted of provocative act murder after 2009, like defendant here, are not eligible for resentencing under Senate Bill No. 1437, defense counsel had a reasonable basis to stipulate that defendant was ineligible for resentencing for his conviction for Jimenez's murder.  (See *Antonelli*, *supra*, 17 Cal.5th at p. 600.)  We therefore conclude defendant's IAC claim fails.  As a result, defendant is bound by that stipulation, which precludes him from resentencing relief for Jimenez's murder.

Defendant argues *Antonelli*, *supra*, 17 Cal.5th at p. 723, and *Taylor*, *supra*, 108 Cal.App.5th 849, show that defense counsel acted unreasonably in stipulating that defendant was liable for the provocative act murder of Jimenez. We disagree. As relevant here, *Antonelli* held only that nonprovocateur accomplices convicted of provocative act murder before the court's 2009 decision in *Concha* are not categorically ineligible for resentencing relief under Senate Bill 1437. Defendant pled guilty to Jimenez's murder two years later, when the law was clear that he could be liable for provocative act murder only if (among other things) he personally harbored malice. As our prior opinion held, that remains true after Senate Bill 1437. *Antonelli* thus does not affect our conclusion that defense counsel reasonably stipulated that defendant was guilty of Jimenez's provocative act murder.

Nor does *Taylor*. The defendant in that case was involved in an armed robbery of drug dealer's motel room where a third party shot and killed one of the defendant's two accomplices. (*Taylor*, *supra*, 108 Cal.App.5th at p. 854.) There, the trial court held in a "somewhat unclear" order that the defendant was not eligible for resentencing relief under Senate Bill 1437 because the court erroneously found he was liable for murder under an invalid felony-murder theory. (*Id*. at p. 866.) The court reasoned, incorrectly, that the defendant was liable for felony murder simply because he was a major participant who acted with reckless indifference to human life when he "participated in the incident" that led to his accomplice's death. (*Ibid*.) This was erroneous because the felony-murder

24

rule is "inapplicable where, as here, the killing was committed by a third party who was not involved in the perpetration of the underlying felony." (*Ibid*.)

The *Taylor* court went on to explain, however, that the defendant could nonetheless be guilty of murder as a nonprovocateur accomplice under a provocative act murder theory because he or his surviving accomplice (or both of them) fired shots in the motel room. (*Taylor*, *supra*, 108 Cal.App.5th at p. 866.) The trial court thus "expressly found that petitioner was *at least* a nonprovocateur accomplice," which could render him liable for provocative act murder under *Concha*. (*Id*. at p. 867.) The *Taylor* court noted that the defendant could be so liable "based on a provocative shooting initiated by [his surviving accomplice]" if the court found that the defendant "knew [that the accomplice] intended to shoot at [the drug dealer] and/or his associates, intended to aid [his accomplice] in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id*. at p. 868.) Because the facts permitted that alternative finding but the trial court erroneously applied a misunderstanding of the law, the *Taylor* court remanded for further proceedings. (*Ibid*.)

*Taylor* thus supports our conclusion that defense counsel reasonably stipulated that defendant was liable for the provocative act murder of Jimenez. As *Taylor* explains, a nonprovocateur accomplice is liable for the provocative act murder of his accomplice so long as the nonprovocateur committed "a life-endangering provocative act," a third party kills in response to that act, and the nonprovocateur "acted with a mens rea sufficient to support a conviction for murder" (i.e., with malice). (*Taylor*, *supra*, 108 Cal.App.5th at

25

p. 865.)  The *Taylor* court held the defendant could be liable for provocative act murder because, at a minimum, he was a nonprovocateur accomplice who may have knowingly aided his surviving accomplice in instigating a gun battle that left their other accomplice dead.  (*Id*. at p. 868.)

For the reasons outlined above, defense counsel could have reasonably concluded that, at a minimum, defendant knowingly intended to aid Jimenez in the life-endangering armed burglary of Ramirez's home, and knowingly intended to aid Jimenez in the gun battle that left Jimenez and Ramirez dead.  *Taylor* thus does not support defendant's position that his counsel committed IAC by stipulating that defendant was liable for the provocative act murder of Jimenez.

### 3.  *Ramirez's Murder*

Defendant next contends that the trial court erroneously found he was ineligible for resentencing relief because there was insufficient evidence that he acted with reckless indifference to human life.  We disagree.

"Reckless indifference to human life has a subjective and an objective element. [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.]  As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the

26

standard of conduct that a law-abiding person would observe in the actor's situation."'" (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

To determine whether a defendant exhibited reckless indifference to human life under section 190.2, subdivision (d), courts consider, among other factors, the following seven questions: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677; see *People v. Clark* (2016) 63 Cal.4th 522, 18-623; see *People v. Guiffreda*, *supra*, 87 Cal.App.5th at pp. 124-125.)

"'[W]e are not aware of a single case that concludes a defendant who personally committed a robbery, used a gun, and was present for the shooting'" did not act with reckless indifferent to human life. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090.) Instead, "[t]he defendants who have shown their culpability was too slight . . . 'are those who were not wielding guns themselves and also not present for the shooting (either because they were acting as getaway drivers or because they were involved in the planning of the crime only).'" (*Ibid*.)

This is not one of those cases. Here, several undisputed facts show that defendant acted with reckless indifference to human life. First, defendant, Jimenez, and Johnson all used guns. Second, defendant was not only at the scene of the crime, he was there for every step—from knocking on the door with guns drawn, to Jimenez knocking F.P. down so they forcibly could enter the house, to approaching Ramirez's bedroom with guns drawn. Although the incident appeared to have taken place quickly, defendant, Jimenez, and Johnson prepared for deadly violence, as evidenced by all three of them using guns, defendant wearing a bulletproof vest, and he and Jimenez forcibly entering the house with guns drawn. Substantial evidence thus supports the trial court's finding that defendant acted with reckless indifference to human life. (See *People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1089 [defendant acted with reckless indifference when "he cooked up a plan to break into the home of a known drug dealer while they were home and to use force, including firearms, to steal the dealer's product" and "pushed [his] way into the home armed" and "used [his] gun[] to threaten the residents and keep them pinned down"].)

Defendant emphasizes that he was left "grievously wounded," "unconscious," and "disarmed of his handgun" after the gun fight with Ramirez but before Johnson shot and killed Ramirez, and argues this shows he could not have acted with reckless indifference at the time Johnson shot Ramirez. We disagree.

The reckless indifference inquiry assesses the defendant's awareness of the dangers posed by the nature of the crime itself, which can be inferred by the likelihood

28

that the victim would resist with lethal force, the perpetrators' use of weapons, and the defendant's knowledge of the killer's propensity for violence. (See *People v. Clark*, *supra*, 63 Cal.4th at pp. 616-623.) A defendant's knowingly *creating* "a grave risk of death" is thus sufficient to find the defendant acted with reckless indifference to human life. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)

Here, defendant's conduct up until he was shot created a grave risk of death to him, his cohorts, and Ramirez. Defendant planned an inherently dangerous, life-threatening armed robbery, fully participated in it, and personally set in motion the brief chain of events that led to Ramirez's death. The fact that all three perpetrators were armed, they forcibly entered a known drug dealer's house by assaulting F.P. at the door, and defendant wore a bulletproof vest is, again, strong evidence that defendant expected Ramirez to use deadly force, which they would have to counter with deadly force. Defendant's planning and participation in this kind of robbery, without more, was sufficient for the trial court to find defendant acted with reckless indifferent to human life, even if defendant was shot unconscious shortly before Johnson killed Ramirez. (See *People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1089.) This is especially true given that that defendant made no efforts to minimize the risk of the robbery, nor did he attempt to aid Ramirez before fleeing. (*People v. Clark*, *supra*, 63 Cal.4th at p. 622.)

And even if defendant and his cohorts only intended to execute the plan by tying up Ramirez (and anyone else), as defendant contends, the violent and dangerous way in which it unfolded was "sufficiently weighty to support the trial judge's finding that he

29

acted in reckless disregard for human life." (*People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1090.)  The fact that it was a planned, armed robbery of Ramirez, a known drug dealer, at his home likewise supported that finding.  (*Ibid*.; see also *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [using a gun during robbery reflects reckless indifference to human life]; *In re McDowell* (2020) 55 Cal.App.5th 999, 1011, 1013 [planning and taking part in armed robbery of a drug dealer's home supported trial court's reckless indifference finding because it is "a crime with a particularly high risk of violence"].)  Defendant's being shot and rendered unconscious immediately before Johnson killed Ramirez thus did not preclude the trial court's supported finding that defendant acted with reckless indifference to human life.

At oral argument, counsel for defendant discussed several times our Supreme Court's decision in *People v. Emanuel* (2025) 17 Cal.5th 867.  On remand, defendant again argues that *Emanuel* should lead us to find that he did not act with reckless indifference.  We again find the case distinguishable in several critical respects, including that (1) it did not involve a provocative act murder, (2) the defendant was not armed, (3) the defendant did not know his cohort would be armed, and (4) the defendant and his cohort robbed the victim in the afternoon in public.  (*Id.* at pp. 875-877.)  In other words, "there was nothing in the [robbery] plan that 'elevated the risk to human life beyond those risks inherent in any armed robbery,' much less a planned unarmed robbery."  (*Id.* at p. 895.)  That cannot be said about this case, where defendant and his two cohorts forcibly entered a drug dealer's home while armed.  *Emanuel* thus provides us little (if

30

any) guidance on our "fact-intensive, individualized inquiry" into whether defendant acted with reckless indifference.  (*In re Scoggins*, *supra*, 9 Cal.5th at p. 683.)

C.  *Sentence*

The trial court imposed an indeterminate sentence of 50 years to life for the murders, plus a determinate sentence of 23 years, 4 months, which included a one-year term for burglary and a 16-month term for attempted robbery.  In his supplemental brief on remand, defendant contends for the first time that the trial court should have stayed these two terms under section 654.  Defendant thus asks us to reduce his determinate sentence by 28 months, for a total of 21 years.  Because the People did not file a brief on remand, we presume they do not oppose defendant's request.

We agree with defendant that the terms for the burglary and attempted robbery should have been stayed under section 654.  That statute "prohibits punishment for two crimes arising from a single, indivisible course of conduct."  (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)  This means that "if all of the crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment."  (*Ibid.*)

Here, the burglary, attempted robbery, and murders all had the same intent and objective: to steal Ramirez's cash and drugs.  Defendant committed all of these offenses in a single, indivisible course of conduct, and they were all part of the same means to accomplish his goal of stealing Ramirez's property.  As a result, the one-year sentence for burglary and the 16-month sentence for attempted robbery should have been stayed.

31

IV.

DISPOSITION

The judgment is modified to stay the terms imposed for burglary (count 3) and attempted robbery (count 4). As modified, the judgment is affirmed. The trial court's order denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>

J.

We concur:

<u>McKINSTER</u>

Acting P. J.

<u>FIELDS</u>

J.